[No. B034109. Second Dist., Div. Four. Mar. 15, 1989.]

In re DEON D., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
DEON D., Defendant and Appellant.

954

**COUNSEL**

Lawrence D. Weber, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Mark Alan Hart and Donald J. Oeser, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**McCLOSKY, J.**—On June 9, 1987, pursuant to Welfare and Institutions Code section 602, a petition was filed charging appellant Deon D. with three counts of assault with a deadly weapon in violation of Penal Code section 245, subdivision (a)(2). As to each count it was further alleged that appellant personally used a firearm within the meaning of Penal Code section 12022.5. Appellant denied the allegations of the petition. The juvenile court found the allegations in count III to be true and sustained the petition as to that count. Counts I and II were dismissed.

In a subsequent Welfare and Institutions Code section 602 petition filed on July 31, 1987, appellant was charged with three counts of rape in concert with another person or persons in violation of Penal Code sections 261, subdivision (2) and 264.1. In count IV, appellant was charged with committing a lewd and lascivious act on the body of a child under the age of 14 in violation of Penal Code section 288, subdivision (a). Appellant denied the allegations of the petition.

Following a joint trial with Mitchell G.,[1] the juvenile court found the allegations set forth in counts I and II of the petition to be true, sustained the petition as to those counts, and declared the offenses to be felonies. Counts III and IV were dismissed.

At the disposition hearing, the juvenile court found that welfare of the minor required that custody be taken from his parents and ordered that appellant remain a ward of the court under Welfare and Institutions Code section 602. The juvenile court then ordered that appellant be placed in the camp community placement program for a period not to exceed 10 years. The court "aggregated confinement time" as follows—nine years for count I on the July 31, 1987, petition and one year on count III of the June 9, 1987, petition. This appeal followed.

On September 20, 1988, appellant's opening brief was filed. Pursuant to *People* v. *Wende* (1979) 25 Cal.3d 436 [158 Cal.Rptr. 839, 600 P.2d 1071],

---

[1] Mitchell G.'s appeal before this division bears case number B031689. The opinion was filed on March 7, 1989 (nonpub. opn.).

appellant requested that this court make its own independent examination of the record on appeal. We did so, and on October 17, 1988, we issued a memorandum to appellant's counsel requesting him to address the following issues which pertain solely to the July 31, 1987, petition:

1. Did witness Tyrone N.'s claimed lack of memory and/or his refusal to testify amount to statements inconsistent with those previously given to Detective Wolchief?

2. If Tyrone's statements were not inconsistent with his trial testimony, was appellant denied his constitutional right of confrontation when the trial court admitted Tyrone's out-of-court statements through the testimony of Detective Wolchief?

Supplemental letter briefs addressing the issues posed by us were received from both parties.

### FACTS

Because the issues on appeal relate solely to two of the rape charges against appellant in the July 31, 1987, petition, only the facts relevant to those crimes will be set forth.

At approximately 4 p.m. on February 20, 1987, 14-year-old Shena W. was walking home from the bus stop when she saw appellant driving his sister's car. Appellant was with his brother Leon, Mitchell G., and Tyrone N. Shena, who had been appellant's girlfriend for five months had broken off the relationship with him three months earlier.

Shena tried to avoid appellant and the others by walking into the park. Tyrone, however, got out of the car, approached Shena and told her that his home boy, whom she understood to be appellant, wanted to talk to her. When Shena kept walking, appellant grabbed her right shoulder and Tyrone grabbed her left arm. Appellant then said "Come on, man, let's walk through this alley. We're going to go dig." Shena understood "digging" to be slang for having sex.

Appellant and Tyrone walked Shena down an alley and into a vacant house. While appellant was looking through the house, Mitchell came in and told them to let Shena go home. Appellant let her go, and Shena left.

As Shena was walking home, appellant and Tyrone reappeared. They grabbed her again, walked through another alley and entered another abandoned house. Appellant started unbuttoning his clothes. He then pushed

Shena down on a mattress. Appellant unbuttoned Shena's clothes and tried to have sex with her. Shena tried to thwart appellant's attempts by moving around. At appellant's direction, Tyrone restrained Shena.

Mitchell arrived at the house with Leon. Appellant told Mitchell to leave. The latter did so but returned a little later saying he was not going to tell and that he just wanted to watch.

Appellant then told Tyrone that he needed some grease. Tyrone could not find any in Shena's purse. Mitchell said his penis was getting hard. Leon left and returned five minutes later with some vaseline. Leon gave the vaseline to Mitchell who in turn handed it to appellant. Appellant put some vaseline on his penis and then had intercourse with Shena. Tyrone held her arms. After appellant ejaculated he got up and told them to look. They laughed at the sperm spilled on the mattress.

Mitchell then whispered something to appellant. They told Shena to bend over. Shena got on her hands and knees. Mitchell tried to have intercourse with Shena in this position. Shena could feel Mitchell's erect penis against her but she was unable to say for sure where on her body it was. Shena testified that she had no doubt that it was Mitchell that came up behind her. She had seen his shoes when he entered the house. When she was on her hands and knees she looked through her legs and saw Mitchell's shoes.

After Mitchell ejaculated, Tyrone tried to have intercourse with Shena, but he was unable to do so.

When Shena started to get up, appellant told her to lie back down. Appellant had intercourse with Shena again. Leon came in and told them to let Shena go home. Shena got up, and Leon helped her out. Shena who was scared and crying throughout the sexual assault left and went home. As Shena was leaving she heard someone say something about killing her. Leon then said, " 'Just remember, if I ever go to jail, always going to be somebody out that's going to be after you.' "

When Shena arrived at home, she told her mother that she had been raped by appellant, Tyrone, and Mitchell. Shena's clothes were dirty, her hair was wild, and she was very upset. After confronting appellant's mother, Shena's mother called the police.

Sometime after 6 p.m. on February 20, 1987, Dr. Brian Johnston examined Shena at White Memorial Hospital. He testified that his examination disclosed evidence of injuries that are inconsistent with consenting sexual intercourse. Dr. Johnston noted that there was evidence of forceful or

vigorous contact and a lack of concern for pain. He opined that Shena's injuries were caused by forced sexual intercourse.

Ronald John Raquel, a criminalist with the scientific investigations division of the Los Angeles Police Department, analyzed blood and saliva samples taken from Shena, appellant, and Mitchell. Mr. Raquel determined that appellant had blood type B and that he was a nonsecretor. His blood type, therefore, could not be detected from semen or saliva.

Shena was determined to be a secretor and to have blood type B. If B antigens had been detected, they would have come from her. Analysis of the vaginal swab that Dr. Johnston took from Shena on February 20 disclosed sperm and blood type A antigen. Forty-five percent of the male population in Los Angeles County is blood type A as is Mitchell. Thirty-five to thirty-seven percent of this population is type A secretors.

Officer Terry McBride testified that on February 20, 1987, he spoke to appellant who stated that he had been with Shena several times before and that on that date she went with him to a vacant garage and voluntarily had sexual intercourse with him. Appellant told Officer McBride that he ran into his friends as he was leaving the garage.

Tyrone refused to answer most of the questions asked by the prosecutor, stating that he was no "snitch." He did, however, testify that he was present while Shena was being raped, that he was involved in the rape, and that he remembered the entire incident. Tyrone testified that he was at the park with appellant and Mitchell when they saw Shena. He admitted that he ran up and said something to her.

Tyrone further admitted that he spoke to Detective Robert Wolchief after his arrest in February and that the detective wrote down his statement and went over it with him. Tyrone did not remember signing his statement but recognized the signature thereon as his own. Tyrone could not read the statement. Tyrone denied, however, that he had "snitched" to Detective Wolchief. Tyrone also denied telling the detective that he was present when Mitchell tried to put his penis into Shena's "butt."

Detective Wolchief testified that on February 26, 1987, he arrested Tyrone and advised him of his constitutional rights under *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. Tyrone waived his rights and Detective Wolchief interviewed him. Detective Wolchief memorialized Tyrone's statement, and Tyrone signed it.

In his statement to Detective Wolchief, Tyrone said that he was with appellant and Mitchell at Slauson Park when they saw Shena. Tyrone ran

up to her and told her that his home boys wanted her. Appellant and Shena walked to an abandoned house. Tyrone and Mitchell entered the house, and Mitchell told appellant to leave Shena alone. Tyrone, appellant and Mitchell left Shena and returned to the park. About a minute later, Tyrone and appellant intercepted Shena, and walked down an alley to an open garage. Once inside, appellant told Shena to pull down her pants and they lay down on a mattress. Mitchell then entered the garage and started watching.

According to Detective Wolchief, Tyrone further stated that Shena was moving around and that at appellant's direction he held her legs until appellant got on top of her. While appellant was having sex with Shena, Mitchell said "You're making my dick hard." Appellant ejaculated and then "tried to stick it in her butt." He was unable to do so, and then Mitchell "tried to stick his dick in Shena's butt" but he could not do so either. Tyrone and appellant then started to play with Shena's breasts. When they were leaving the garage, Leon came in and helped Shena out of the garage. Shena was crying when appellant was on her and when she was walking home.

Appellant's mother was called as a defense witness. She testified that when Shena's mother confronted her and told her that appellant had raped Shena, she did not notice anything unusual about Shena. Appellant's mother testified that Shena's clothes were not torn or dirty and her hair was not messed up.

## DISCUSSION

■ Appellant challenges the admission of Tyrone's statement as a prior inconsistent statement.

While Tyrone was on the witness stand, he selectively answered questions posed by the prosecutor and blatantly refused to answer any question he did not want to answer. Counsel was appointed to advise Tyrone of the consequences of his refusal to answer. Despite threats of contempt, Tyrone persisted in refusing to answer questions he did not wish to answer.

The juvenile court found Tyrone's conduct to be contemptuous and declared by virtue of that conduct that he was unavailable. The court later retracted its unavailability determination and stated that Tyrone was not unavailable but rather was just unwilling to testify.

The juvenile court further admitted Tyrone's statement to Detective Wolchief in evidence as a prior inconsistent statement. Specifically, the court found "by the statement, 'I don't want to be a snitch, I don't want to testify,

I don't want to answer any questions,' that he is stating a position inconsistent with what may have been a prior statement. I don't know what the prior statement is yet, but I find that that may be inconsistent or consistent with a statement given on a prior occasion." The juvenile court stressed that the minors would be given adequate cross-examination at such time as they sought to do so.

■ Admission of a witness's prior inconsistent statement for impeachment or as substantive evidence of the matter asserted does not violate a defendant's state or federal constitutional right to confrontation where the declarant is a witness at trial and is subject to full cross-examination. (*California* v. *Green* (1970) 399 U.S. 149, 153-164 [26 L.Ed.2d 489, 494-501, 90 S.Ct. 1930]; *People* v. *Chavez* (1980) 26 Cal.3d 334, 352-353, 361 [161 Cal.Rptr. 762, 605 P.2d 401]; *People* v. *Green* (1971) 3 Cal.3d 981, 985 [92 Cal.Rptr. 494, 479 P.2d 998], cert. dism. *Green* v. *California,* 404 U.S. 801 [30 L.Ed.2d 34, 92 S.Ct. 20].)

Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."

Evidence Code section 770 states: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless:

"(a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or

"(b) The witness has not been excused from giving further testimony in the action."

Before a prior inconsistent statement may be admitted to attack credibility or as substantive evidence, the out-of-court statement must be inconsistent with some portion of the witness's current trial testimony. (*People* v. *Plasencia* (1985) 168 Cal.App.3d 546, 551 [223 Cal.Rptr. 786].)

In *People* v. *Green, supra,* 3 Cal.3d 981, defendant was convicted of furnishing marijuana to a minor. The prosecution's chief witness Melvin Porter was the minor to whom defendant Green had furnished marijuana. The witness testified that defendant called him and told him he had some marijuana to sell and that he agreed to sell it for defendant. At this juncture,

however, the witness became evasive and claimed a lapse of memory when asked about defendant's involvement.

The *Green* court noted that the witness's reluctance to testify against defendant was readily apparent and that the trial court could reasonably disbelieve the witness's claim that he could not remember how he came to possess the marijuana. The trial court had indicated its position that the witness's memory lapse regarding the actual transfer of the marijuana was inherently incredible since the witness had admitted that he remembered the events transpiring before and after he acquired the marijuana.

In concluding that the witness's trial testimony was materially inconsistent with his preliminary hearing testimony and an out-of-court statement made to the police, the *Green* court stated: "In normal circumstances, the testimony of a witness that he does not remember an event is not 'inconsistent' with a prior statement by him describing that event. (*People* v. *Sam* (1969) 71 Cal.2d 194, 208-210 [77 Cal.Rptr. 804, 454 P.2d 700], and cases cited.) But justice will not be promoted by a ritualistic invocation of this rule of evidence. Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement [citation], and the same principle governs the case of the forgetful witness. In contrast to *Sam,* in which the witness had no recollection whatever of the prior incident, here Porter admittedly remembered the events both leading up to and following the crucial moment when the marijuana came into his possession, and as to that moment his testimony was equivocal. For the reasons stated above, we conclude that Porter's deliberate evasion of the latter point in his trial testimony must be deemed to constitute an implied denial that defendant did in fact furnish him with the marijuana as charged. His testimony was thus materially inconsistent with his preliminary hearing testimony and his extrajudicial declaration to Officer Wade, in both of which he specifically named defendant as his supplier. Accordingly, the two prior statements of this witness were properly admitted pursuant to Evidence Code section 1235." (3 Cal.3d at pp. 988-989.)

■ Appellant contends that "Tyrone's refusal to answer questions at trial did not amount to statements inconsistent with those previously given to Detective Wolfchief [*sic*]."

First, contrary to appellant's characterization of the record, Tyrone did answer some questions pertaining to the offense and the statement which he gave to Detective Wolchief. Specifically, Tyrone testified that he had admitted his involvement in the rape of Shena. He further admitted that he was there while she was being raped, that he remembered the entire incident, and that he talked about it in detail with the prosecutor. Tyrone also

testified that he told the prosecutor that he did not want to testify because he was no "snitch."

Tyrone also admitted that he had talked to Detective Wolchief after his arrest, that the detective had written down his statement, and went over it with him. Tyrone did not remember signing his statement but recognized the signature thereon as his own. Tyrone could not read the statement.

Expressly inconsistent with the statement Tyrone gave Detective Wolchief was his in-court denial that he had "snitched" to Detective Wolchief and his denial that he told Detective Wolchief that he was present when Mitchell tried to put his penis in Shena's "butt." With regard to Tyrone's obstructionist behavior, we see no reason to treat Tyrone's blatant refusal to answer specific questions posed by the prosecutor any differently than the *Green* court treated Porter's evasive answers and supposed lapses of memory which stemmed from a desire not to testify. We conclude that under the circumstances of this case the trial court properly concluded that Tyrone's in-court testimony, as well as his refusal to answer questions, was materially inconsistent with his statement to Detective Wolchief.

This case is distinguishable from *People* v. *Rojas* (1975) 15 Cal.3d 540 [125 Cal.Rptr. 357, 542 P.2d 229, 92 A.L.R.3d 1127], in which this state's high court found error in admitting witness Navarrette's prior testimony pursuant to Evidence Code section 1235. Because of fear, Navarrette refused to testify at the trial. Noting that under Evidence Code section 1235 the statement sought to be introduced had to be inconsistent with the witness's testimony at the hearing in which the prior inconsistent statement is sought to be introduced, the *Rojas* court held that "whether Navarrette's refusal to testify at all is in effect a 'statement' inconsistent with earlier statements is irrelevant in view of the fact that Navarrette did not testify at the hearing at which the question of admissibility of the testimony arose." (15 Cal.3d at p. 548.)

Also distinguishable from this case is *People* v. *Rios* (1985) 163 Cal.App.3d 852 [210 Cal.Rptr. 271], in which witnesses Torres and Carrillo refused to answer any questions at trial. The *Rios* court concluded that because Torres's and Carrillo's out-of-court statements were not inconsistent with their trial testimony, they were not properly admitted pursuant to Evidence Code section 1235 as prior inconsistent statements. Noting that appellate courts had consistently applied the rule that "there is no 'testimony' from which an inconsistency with any earlier statement may be implied when the witness honestly has no recollection of the facts," the *Rios* court found that "the same result is required where a witness gives no testimony and refuses to answer all questions." (163 Cal.App.3d at p. 864.)

The *Rios* court further stated that when a witness gives no testimony there is simply no evidence from which a finding of inconsistency can be made, and Evidence Code section 1235 does not apply. (*Ibid.*)

*Douglas* v. *Alabama* (1965) 380 U.S. 415 [13 L.Ed.2d 934, 85 S.Ct. 1074] and *People* v. *Shipe* (1975) 49 Cal.App.3d 343 [122 Cal.Rptr. 701], on which appellant relies are also distinguishable.

In the case at bench, although Tyrone did selectively refuse to answer some questions posed by the prosecutor, he did give sufficient testimony which supports a finding that his in-court testimony was inconsistent with his statement to Detective Wolchief.

■ Appellant contends that "permitting Detective Wolfchief [*sic*] to testify as to out-of-court statements made by Tyrone deprived appellant of his constitutional right of confrontation." We disagree.

After the prosecution rested its case, appellant's trial counsel asked the juvenile court to reconsider its admission of Tyrone's statement to Detective Wolchief arguing that its admission denied appellant his constitutional right to confrontation. Appellant argued that the requirement of cross-examination is not met where the officer who takes the declarant's statement is cross-examined. To that argument the juvenile court stated: "[L]et me just stop you right there. As I understand it, the minor Tyrone [N.] is available for cross-examination. All you have to do is just ask the bailiff to bring him in, he's here."

Appellant's trial counsel then argued that if Tyrone refused to answer his questions, then there would be nothing to cross-examine him about. The juvenile court responded: "Well, you have the right to cross-examine him, direct and cross-examine him. You can take him as an adverse witness if you choose, but your right to cross-examine him has not been foreclosed. He is available. He's as available to you as he was to the district attorney."

The juvenile court also expressed its position that Tyrone had in fact given testimony at trial that was inconsistent with his statement to Detective Wolchief stating: "And it was quite obvious when [Tyrone] was testifying, that he did know the facts and circumstances of the encounter between [Deon], [Mitchell] and victim, and that he chose not to answer any questions because as he said, he didn't want to be a snitch. I think that's grossly inconsistent with the statement he gave to the police."

Despite the trial court's statements that the minors' counsel could cross-examine Tyrone about his statement to Detective Wolchief and that Tyrone

who was being detained would be made available, appellant's trial counsel made no attempt to question Tyrone about his statement after Detective Wolchief testified and read Tyrone's statement into the record.

Appellant cannot prove that he was denied a meaningful opportunity to cross-examine Tyrone simply because Tyrone selectively refused to answer questions asked by the prosecutor. One who does not attempt to exercise his right of confrontation cannot successfully claim a deprivation of that right.

Whether appellant would have been deprived of his right of confrontation had he attempted to question Tyrone and had the latter refused to answer his questions is an issue we need not, and do not, decide.

The judgment is affirmed.

Woods (A. M.), P. J., and Goertzen, J., concurred.