Filed 1/27/21  P. v. Carrizales CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ENRIQUE ALFREDO CARRIZALES,<br><br>Defendant and Appellant. | F077378<br><br>(Super. Ct. No. VCF279745D)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Joseph A. Kalashian, Judge.*

Law Office of Nicco Capozzi and Nicco Capozzi for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Clara M. Levers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*Retired Judge of the Tulare Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**INTRODUCTION**

Four masked men committed a home invasion during which one of the men shot the homeowner in the left shoulder and another perpetrator shot him in the abdomen. Three of the perpetrators were apprehended after a car chase. Defendant Enrique Alfredo Carrizales was later charged in connection with the offense. At trial, the prosecution introduced evidence defendant had confessed to the police over the phone regarding his involvement in the crime, asserting gang members forced him to participate.

A jury convicted defendant of attempted murder, conspiracy to commit robbery, attempted home invasion robbery in concert, first degree burglary, street terrorism, and criminal street gang conspiracy and found true several enhancement allegations. On appeal, defendant argues the trial court abused its discretion in admitting a coperpetrator's out-of-court identification of defendant as the gunman, arguing though the coperpetrator was available for cross-examination at trial, because he would not answer questions, the hearsay exception for a prior inconsistent statement did not apply; there was no evidence to support a finding of inconsistency. He further contends the admission of such evidence violated his right to confrontation and prejudiced him.

We affirm the judgment.

**FACTUAL BACKGROUND**

Damion W. lived with S.W. and their two children on a 100-acre property on a hill reached by way of a winding, 19-mile road. S.W.'s three siblings, including her brother, T.W., lived with them until they turned 18. At some point, T.W. got involved with gangs. Around his 18th birthday, T.W. moved out. About four months before the home invasion giving rise to the charges in this case, T.W. told Damion if Damion did not permit T.W. and his friends to grow marijuana on Damion's property, they would kill Damion. T.W. told Damion, "'My friends aren't happy with this. I'm gonna get down here whether you like it or not.'"

2.

On February 26, 2013, S.W. was homeschooling her children when the front door "came busting open." S.W. went to close it when a masked man appeared with a handgun. He asked S.W., "'Where is he?'" The masked man entered the house, and another masked man with a shotgun held S.W. against the wall and repeatedly asked her, "'Where's the cash?'" Damion was in the shower when the men entered. Damion's children ran into the bathroom and told him masked men were holding S.W. at gunpoint.

Damion peeked outside of his room and saw four to five people. The masked men wore all black and had on gloves. Immediately, one of them pointed a handgun at Damion and started running towards him; the gunman said, "'There's that fucker. I'm gonna kill him.'" Damion heard a loud noise and believed the gunman had shot at him and missed. Damion ran and hid behind a towel rack. The masked man approached with the handgun pointed, but Damion managed to punch him. A struggle ensued during which the gun went off. Damion was shot in the left shoulder and another bullet grazed his head; he was "bleeding profusely." Damion continued to fight and managed to wrestle the gun away from the attacker and take off his mask. Damion hit the attacker in the head multiple times with the gun. The attacker then ran away holding his head.

Damion then tried to check on S.W. when a second masked man stepped in front of him and loaded a shotgun. The second masked man shot Damion in the abdomen from approximately eight feet away.[1] Damion again tried to walk to check on S.W. He saw her by the front door where another masked man held a shotgun pointed at her head. Damion slipped in his own blood and fell to the floor. The man holding the shotgun to S.W.'s head asked Damion where the cash was; Damion responded they had none. Another man appeared in the doorway. Then the man with the handgun, whom Damion regarded as the leader, left and the others followed.

---

[1]S.W. explained the second shooter was the same person who initially held a shotgun towards her head. When he left to approach Damion, another masked man then held her at gunpoint.

Detective Bari Molyneux was patrolling around 9:40 p.m. that night when he was instructed to respond to a location for the potential landing of an air ambulance. As he was responding, he heard deputies and a sergeant who were responding to the actual crime say they passed two cars coming down the hill. Detective Molyneux positioned his vehicle and waited for the cars to come down. He saw two cars approach and run a stop sign; he followed them. The cars approached an intersection where the second car, a Chevrolet, passed the first, a Mercedes.

Detective Molyneux advised the Woodlake Police Department the Chevrolet was headed toward their city. He then conducted a traffic stop on the Mercedes and detained the three occupants: the driver, Michael Serna, the front passenger, Sierra Green, and the back passenger, Juventino Rosas. Detective Molyneux did a cursory search of the car and found a black bandana and a cellular phone on the floorboard of the driver's seat. There was a glove in the front passenger side panel and another cellular phone in the backseat. Serna, Green, and Rosas were then transferred to the police substation.

Sergeant Frank Zaragoza with the Tulare County Sheriff's Office pursued the Chevrolet. The police used a spike strip to flatten the vehicle's tires. Even after running over the strip, the Chevrolet continued on. It pulled over as someone exited the car and fled on foot toward a fenced property. Deputy Carlos Lara then pointed his patrol vehicle towards the front of the Chevrolet; the Chevrolet sped up and hit the front of Deputy Lara's car before accelerating past it. The Chevrolet turned and ran through one fence and then crashed into another. The driver, Thomas Cuadros, was still inside the car. The police approached and restrained him. The police found a black handgun and black clothing on the right passenger side and a rifle and ammunition in the trunk.

At trial, Sierra Green testified she was at Woody's Ice House on February 26, 2013, with Mike Serna and other people she did not know. They were "gonna go up to the mountains and drink beer." She rode in a car with Serna and Juventino Rosas up a winding road in a gray Mercedes. They stopped once to get beer and then two more

4.

times during which Green relieved herself outdoors. Green explained there was initially only one car but by the third stop another car had joined. On the third stop, Green left the car to relieve herself and Serna and Rosas also left the car. When Green returned to the car, she was "on the phone" for approximately 10 minutes until Serna and Rosas returned. When they returned, the mood had changed from fun to quiet and Serna said, "'I can't believe it just happened,'" or "'I can't believe they did that,'" or "'I can't believe they shot him.'" Rosas said, "'We're good, we're good.'" Green recalled getting pulled over and speaking with police afterwards. Police showed her photographic lineups and she identified Thomas Cuadros as one of the people she was with at Woody's Ice House and as one of the occupants of the vehicles.

Tori S. testified she had been staying at the home of defendant's cousin, Carmen, on March 16, 2013, when defendant arrived. Defendant explained he was selling marijuana and had to "pay taxes" to the Norteño gang, but the Norteños told him he would not have to pay the taxes if he did a "job" for them. So, defendant accompanied other Norteños in a car to a house where they told him what to do. They told him there was $20,000 worth of money and marijuana inside the house and, if he got it, he would not have to pay taxes. They kicked in the door. According to defendant, one of the people he was with accidentally fired a gun during the incident.

Defendant told Tori "he wanted to feel … how it was to murder somebody, to kill somebody," so he "shot off a sawed-off rifle, a gauge, at the victim['s stomach]." Defendant then got scared and left. He told Tori they jumped in the car and "took off," and he jumped out of the car and ran before it hit a fence. He jumped over some fences and went to the home of his stepfather's mother where he burned the clothes he was wearing. Defendant told Tori he was going to talk to the detective himself and turn himself in. He also told her that if she told on him, the Northerners had her information and knew where she lived. He said if law enforcement came after him, "there was gonna be gunfire. He was not gonna go out." Tori and Carmen took defendant to a hotel to

"hide him." Tori then called the sheriff's office and "got out of there" because she was scared.

Following the home invasion, Sergeant Steven Sanchez received a description of a suspect. He accessed a mugshot of defendant in the police database matching the description. After attempts to locate defendant, Sanchez received a phone call from a voice he testified he recognized to be defendant's. Sanchez recorded the call. The People introduced the recording at trial.

On the call, the caller stated, "You're looking for me because I was part of that incident." He stated people threatened his life and, if he did not do this for them, they would "hit" him. He said he panicked, he did not mean to shoot the guy; there was a gun pointed at him; he ran off and was "so scared." Deputy Sanchez also recorded a subsequent conversation he had with defendant on videotape when defendant was apprehended in Washington State, which was also played for the jury. During their conversation, defendant admitted he had previously called Sanchez and that he had the "nerve" to tell him the truth.

As a result of the incident, Damion went to the hospital and underwent surgery. He stayed in the hospital for seven days during which he had a catheter and had to relearn how to walk.

The jury convicted defendant of attempted murder (Pen. Code, §§ 189, 664; count 1), conspiracy to commit robbery (§§ 182, subd. (a)(1), 211; count 2), attempted home invasion robbery in concert (§§ 664, 211, 213, subd. (a)(1)(A); counts 3 & 4), first degree burglary (§ 459; count 5), street terrorism (§ 186.22, subd. (a); count 6), and criminal street gang conspiracy (§ 182.5; count 7). The jury further concluded count 1 was committed willfully, deliberately and with premeditation (§ 664, subd. (a)); a principal had personally discharged a firearm, a shotgun, which resulted in great bodily injury (GBI) as to counts 1–4 (§§ 12022.53, subd. (d), (e)(1)); the offenses in counts 1–5 resulted in GBI within the meaning of section 12022.7, subdivision (a); as to counts 2–4,

6.

a principal had discharged a firearm, a handgun, which resulted in GBI (§ 12022.53, subd. (c)); and a gang enhancement as to counts 1–5 (§ 186.22, subd. (b)).

## DISCUSSION

Defendant challenges the admission of testimony regarding coperpetrator Rosas's out-of-court statement identifying defendant as the "triggerman" on hearsay and confrontation clause grounds.

### A.      Relevant Procedural History

During trial, Juventino Rosas took the stand. After Rosas stated his name for the record, the prosecutor indicated she was going to show him a picture; Rosas said, "I'm not testifying." The prosecutor proceeded to show Rosas photographs that had been entered as exhibits and asked Rosas if he could identify the person in the photographs. After the court instructed Rosas to respond, Rosas responded he recognized the photographs and identified the subject in the photographs as himself. The prosecutor then asked Rosas to identify the tattoos reflected in the photographs. He testified regarding some of the tattoos, including the word "dynamite," his wife's initials, the street name "Magnolia," a girl, a "[w]eed plant," a map of California with the letters "TC" and "N" (which he suggested stood for Northern California) inside, and his mother's name, but he denied knowledge of the significance of others such as an "X4" and a star.

In response to the prosecutor's questions regarding the significance of these other tattoos Rosas responded, "None. There's no difference to none of it. I'm not a gang member no more. I dropped out of a gang, so I don't have—." The prosecutor then asked Rosas to which gang he had belonged, but Rosas said "none"; he denied he was a Norteño or that he knew what a Norteño was. The prosecutor then asked Rosas multiple questions regarding his gang affiliation based on Rosas's testimony that he had dropped out of a gang. Rosas responded he did not know what a dropout was and did not know

7.

whether he knew any gang members. He denied "hang[ing] out" with gang members in the past. The prosecutor then showed Rosas a picture and asked him if he recognized it; Rosas stated he did not want to answer and he was pleading the Fifth Amendment. The court stated Rosas had that right with regard to testifying about his tattoos.

Rosas testified he had a cellular phone before being taken into custody and that the passcode was 1414 which, he testified, was his wife's birthday. When asked whether he spoke with Sergeant Marks and Detective Sanchez in 2013, Rojas stated he "might have." He admitted he had been to Woody's Ice House once or twice but, when shown photographs by the prosecutor of individuals, Rosas stated he did not recall whether he knew any of them or whether he was with any of them when at Woody's. When asked if he was with a specific person the night he was at Woody's, Rosas stated he was "totally drunk," "so intoxicated, cocained out," "that's the only part [he] remember[ed]"; he stated, "[A]fter that, I don't remember anything." Rojas stated he was drunk so he could not recall if he went for a drive after, or if Michael Serna or Thomas Cuadros drove his car, and he did not recall what car he drove at the time but it "might've been" a silver Chevrolet Malibu.

The prosecutor then asked Rosas what happened the night he was taken into custody. Rosas responded, "I'm not going to answer the question." The court directed Rosas to answer, but Rosas again stated he was not going to answer the question. The court advised Rosas if he did not answer, the court would hold him in contempt. Rosas stated, "That's fine. I'm not going to answer the question." Rosas refused to answer any more of the prosecutor's questions, and the court held him in contempt and ordered he be taken back into custody.

Defense counsel asked that Rosas be subject to recall and moved to strike the entirety of his testimony. The court denied the motion to strike, and defense counsel stated on the record he was "unable to cross-examine" Rosas. The court advised defense counsel he could "certainly attempt to cross-examine" Rosas if he wanted. The

prosecutor then asked, for the record, whether "defense counsel gave up his right to cross-examine [Rosas] at this point." The court noted, "The record speaks for itself." The prosecutor clarified, "I believe that you held him in contempt and then he left. Did defense counsel have an opportunity to maintain—." The court then stated, "He certainly did. And he said he's subject to recall."

While the next witness was testifying, the bailiff notified counsel that Deputy Scott Glasgow heard Rosas identify defendant as "the triggerman" when he was leaving court. The prosecutor asked to bring Rosas back to the stand to question him about the statement, and the court permitted Rosas to be recalled on that basis. Defense counsel objected. The prosecutor then asked Rosas about the alleged statement. Rosas refused to answer any questions related to the statement, and defense counsel objected to the continuation of questioning. The court then permitted Rosas to step down from the stand. The relevant exchange regarding Rosas's statement was as follows:

> "[PROSECUTOR:] Q. Mr. Rosas, when you left the court after testifying this afternoon, did you make a comment about this case?
>
> "[ROSAS:] A. I'm refusing to answer.
>
> "THE COURT: Once again, you're ordered to answer.
>
> "[ROSAS]: That's fine. I refuse to answer. Thank you, sir.
>
> "THE COURT: Ask the next question.
>
> "[PROSECUTOR:] Q. Isn't it true that when you left, that you said that [defendant] was the triggerman?
>
> "A. I refuse to answer.
>
> "[DEFENSE COUNSEL]: I'd object to that.
>
> "THE COURT: On what grounds?
>
> "[DEFENSE COUNSEL]: On the grounds that there is no good faith belief that that is the—that that statement was made.

"THE COURT:  Overruled.

"[PROSECUTOR:] Q.  What is the triggerman?

"A.  I refuse to answer.

"Q.  When you went out of the courtroom, were you escorted by law enforcement?

"A.  I refuse to answer.

"[DEFENSE COUNSEL]:  Your Honor, I would object to this continuing.

"THE COURT:  I think you've established what you wanted to.

"[PROSECUTOR]:  Thank you.

"THE COURT:  Okay.  You can step down."

Defense counsel argued Rosas's alleged statement was "testimonial," and Rosas "tenaciously refused to answer any questions propounded by anyone about anything." Defense counsel further argued he was "entitled to cross-examine" Rosas and, if Rosas refused to answer any questions, defense counsel could not cross-examine him.  The court responded:  "Well, you can.  You might not be able to effectively cross-examine, but he's available for cross-examination."  Defense counsel asserted he needed "to actually have a meaningful opportunity to cross-examine [Rosas].  It's not enough for a witness to get on the witness stand and answer any questions proposed to the witness by one party and then when the other party turns to cross-examine him saying I'm not answering any of your questions."  The court responded, "[H]e's not answering questions propounded by the prosecution, either."  Defense counsel also asserted Rosas's alleged statement was "not inconsistent with anything because he's simply refused to answer any questions.  He hasn't denied making the statement.  He hasn't attempted to explain the statement.  He's just said I'm not answering any questions about the statement."  Defense counsel noted his objections were based on confrontation grounds (*Crawford v. Washington* (2004) 541 U.S. 36) and hearsay.  The court held it saw "no Crawford

violations" or "a hearsay objection," noting "[h]e's here to testify. Now, if he says he's not going to testify, that doesn't make him unavailable. Unavailable is if he has a valid Fifth Amendment privilege not to testify or some other valid legal reason. He doesn't. He was ordered to testify. We'll bring him in and see if he wants to testify regarding this, but there's no Crawford violations." The court noted Rosas would be subject to recall so defense counsel could cross-examine him once the statement was introduced.

The prosecutor again called Rosas to the stand and asked him if he spoke to Deputy Glasgow when he exited court the day before. Rosas repeatedly stated he would not answer any questions. Defense counsel then cross-examined Rosas and Rosas refused to answer any questions:

> "[DEFENSE COUNSEL:] Q. Mr. Rosas, do you consider yourself an honest man?
>
> "A. I'm not going to answer your questions.
>
> "Q. So—well let me ask you this: Do you—do honest people participate in home-invasion robberies? [¶] … [¶]
>
> "[ROSAS:] I'm not going to answer your questions. [¶] … [¶]
>
> "Q. Do honest people engage in graffiti of convenience stores?
>
> "A. I'm not going to answer your questions.
>
> "Q. Now, were you offered immunity for your continual?
>
> "A. I'm not going to answer your questions.
>
> "Q. Were you ever offered—let me ask you this: Were you ever charged in connection with a home-invasion robbery …?
>
> "A. I'm not going to answer your questions.
>
> "Q. Were you convicted of participating in a home-invasion robbery …?
>
> "A. I'm not going to answer your questions.

11.

"Q. Were you sentenced to more than ten years in prison?

"A. I'm not going to answer your questions.

"THE COURT: Counsel, he's not going to answer any questions. It's obvious.

"[DEFENSE COUNSEL]: I would like to cross-examine. I would like to complete my cross-examination.

"THE COURT: How many more questions? [¶] … [¶]

"[DEFENSE COUNSEL]: I don't have very many more questions.

"THE COURT: Go ahead.

"[DEFENSE COUNSEL:] Q. In exchange for testimony in this case, were you offered consideration for sentencing?

"A. I'm not going to answer your questions.

"[DEFENSE COUNSEL]: I have no further questions. [¶] … [¶]

"[DEFENSE COUNSEL]: Your Honor, again, at this time Mr. Rosas has refused to submit to cross-examination, so I'm objecting to any of his statements coming in.

"THE COURT: You had an opportunity to attempt to cross-examine him."

The prosecutor called Deputy Glasgow to the stand. Glasgow testified he was transporting Rosas from the courtroom to the holding cell and asked Rosas, "Who is this guy?" Rosas responded, "The triggerman." On cross-examination, defense counsel asked Glasgow who he was referring to by saying "this guy," and Glasgow responded he was referring to defendant. Defense counsel then noted "this testimony is subject to moving to strike on Crawford."

12.

### B. Standard of Review and Applicable Law

#### 1. *Confrontation clause*

We review de novo the issue of whether testimony or evidence violated the defendant's rights under the confrontation clause. (*People v. Garcia* (2020) 46 Cal.App.5th 123, 168; *People v. Giron-Chamul* (2016) 245 Cal.App.4th 932, 964.)

Both the United States and California Constitutions guarantee the right of criminal defendants to confront and cross-examine witnesses against them. (U.S. Const., 6th Amend.; Cal. Const., art I, § 15; *United States v. Owens* (1988) 484 U.S. 554, 557; *People v. Carter* (2005) 36 Cal.4th 1114, 1172.) "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.… [T]he cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i.e.*, discredit, the witness." (*Davis v. Alaska* (1974) 415 U.S. 308, 316.) However, "'[t]he Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish."'" (*Owens*, *supra*, at p. 559.)

A witness's refusal to answer some questions while otherwise testifying at length will generally satisfy the constitutional right to confrontation, so long as "'[his] presence at trial as a testifying witness gave the jury the opportunity to assess [his] demeanor and whether any credibility should be given to [his] testimony or [his] prior statements.'" (*People v. Homick* (2012) 55 Cal.4th 816, 861 (*Homick*).) However, a witness who "refuses to answer any question on direct or cross-examination denies a defendant the right to confrontation which contemplates a meaningful opportunity to cross-examine the witness." (*People v. Rios* (1985) 163 Cal.App.3d 852, 864 (*Rios*); see *Douglas v. Alabama* (1965) 380 U.S. 415, 420 (*Douglas*) [holding confrontation clause was violated where witness refused to answer any questions].)

13.

### 2. *Hearsay exception for prior inconsistent statement*

"We review the trial court's rulings on the admission of evidence for abuse of discretion. [Citation.]… [¶] 'A statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement under the conditions set forth in Evidence Code sections 1235 and 770.' [Citation.] 'The "fundamental requirement" of section 1235 is that the statement in fact be *inconsistent* with the witness's trial testimony.' [Citation.] '"Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness'[s] prior statement ….."' [Citation.]" (*People v. Cowan* (2010) 50 Cal.4th 401, 462, fn. omitted; see *Homick*, *supra*, 55 Cal.4th at p. 859.)

"Thus, for example, '"[w]hen a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied. [Citation.] As long as there is a reasonable basis in the record for concluding that the witness's 'I don't remember' statements are evasive and untruthful, admission of his or her prior statements is proper. [Citation.]"'" (*Homick*, *supra*, 55 Cal.4th at p. 859; see *People v. Ledesma* (2006) 39 Cal.4th 641, 711.) Similarly, under the circumstances of a particular case, a witness's refusal to answer may be materially inconsistent with prior statements, exposing the witness to impeachment under Evidence Code section 1235. (*Homick*, *supra*, at p. 859; accord, *In re Deon D.* (1989) 208 Cal.App.3d 953, 961.)

### C. Analysis

Defendant contends the court abused its discretion in admitting Deputy Glasgow's testimony regarding Rosas's "triggerman" statement. He asserts the "triggerman" statement was not inconsistent with any of Rosas's trial testimony and, thus, it was improperly admitted pursuant to Evidence Code section 1235. He further contends the admission of such testimony violated his Sixth Amendment right to confrontation and amounted to prejudicial error. We cannot conclude the court erred in admitting such testimony and further conclude any alleged error was harmless.

14.

### 1. No confrontation clause violation

First, we reject defendant's argument his right to confrontation was violated. Here, Rosas selectively answered the prosecutor's questions. The record does not reflect defense counsel attempted to cross-examine Rosas the first two times he took the stand. Rather, defense counsel asked him no questions and simply noted Rosas would be subject to recall. Defendant "cannot prove that he was denied a meaningful opportunity to cross-examine [Rosas] simply because [Rosas] selectively refused to answer questions asked by the prosecutor. One who does not attempt to exercise his right of confrontation cannot successfully claim a deprivation of that right." (*In re Deon D.*, *supra*, 208 Cal.App.3d at p. 964.)

And when Rosas eventually took the stand for a third time regarding his alleged statement to Deputy Glasgow identifying defendant as the "triggerman," defense counsel had the opportunity to cross-examine him. While Rosas's refusal to answer defense counsel's questions "'narrowed the practical scope of cross-examination, [his] presence at trial as a testifying witness gave the jury the opportunity to assess [his] demeanor and whether any credibility should be given to [his] testimony or [his] prior statements. This was all the constitutional right to confrontation required.'" (*Homick*, *supra*, 55 Cal.4th at p. 861; accord, *People v. Perez* (2000) 82 Cal.App.4th 760, 766.) Also, as discussed further *post*, defendant does not persuasively explain how Rosas's silence during cross-examination specifically prejudiced his defense, falling short of providing a basis for reversible error. (See *Homick*, *supra*, at p. 861.) Accordingly, we cannot conclude his right to confrontation was violated.

### 2. Trial court did not abuse its discretion in admitting the testimony

We also cannot conclude the court abused its discretion in admitting Deputy Glasgow's testimony regarding Rosas's out-of-court statement. Defendant relies on *Rios*, *supra*, 163 Cal.App.3d 852, in support of his argument that Rosas's out-of-court statement was not inconsistent with his trial testimony and, thus, was admitted in error.

In *Rios*, the prosecutor sought admission of prior statements of two witnesses to corroborate an accomplice's testimony implicating the defendant as the murderer. (*Rios*, *supra*, 163 Cal.App.3d at. p. 860.) The first witness told police the defendant admitted to the witness that he shot the victim during an attempted burglary because he was afraid of being identified. (*Ibid*.) However, the witness refused to answer any questions at the preliminary hearing, was held in contempt and sentenced to six months in county jail, and informed the trial court he would again refuse to answer any questions (besides stating his name), though he had no privilege and could face further contempt charges. (*Ibid*.) The second witness reported to police he gave the defendant a gun on the day of the murder and the witness heard a shot about five minutes later. (*Ibid*.) He, too, refused to testify at trial to anything but his name and age. (*Id*. at pp. 860–861.) The trial court held the refusals to answer by the witnesses would constitute an evasion or implied denial of their earlier statements to police. (*Id*. at p. 860.) Thus, the statements were admissible as inconsistent statements under Evidence Code section 1235. (*Rios*, *supra*, at p. 860.) The *Rios* court reversed, concluding the admission of the witnesses' prior statements violated the defendant's right to confrontation and the rules against hearsay; it held there is no testimony from which an inconsistency with any earlier statement may be implied when a witness gives no testimony and refuses to answer all questions. (*Rios*, at p. 864; see *id.* at pp. 862–864.) The *Rios* court further held, "[T]he admission of a prior statement made by a witness who stonewalls at trial and refuses to answer any question on direct or cross-examination denies a defendant the right to confrontation which contemplates a meaningful opportunity to cross-examine the witness." (*Rios*, at p. 864 [noting "[s]urrounding circumstances may give assurance of reliability to statements not subject at the time to cross-examination and provide the jury with factors for judging the credibility of the witness and the truthfulness of the testimony"].)

The People contend *Deon*, *supra*, 208 Cal.App.3d 953 is more analogous to this case than *Rios*. In *Deon*, the defendant challenged the admission of a witness's out-of-

16.

court statement where the witness selectively answered questions posed by the prosecutor and blatantly refused to answer any question he did not want to answer. (*Deon*, *supra*, at p. 959.) The *Deon* court held, though the witness selectively refused to answer some questions posed by the prosecutor, unlike in *Rios*, he gave sufficient testimony which supported a finding his in-court testimony, in which he denied "snitching" and telling the detective he was present during an act of sexual assault, was inconsistent with his statement to police. (*Deon*, at p. 963.)

We conclude the instant case is distinguishable from *Rios*. "This is not a case where a witness took the stand and refused to testify at all, thus providing no basis for the trial court to find inconsistency in effect." (*Homick*, *supra*, 55 Cal.4th at p. 860.) Rather, as discussed, Rosas did testify, albeit selectively. He admitted to having gone to Woody's Ice House but denied recalling anything that occurred later that night because he was so intoxicated. The trial court could have reasonably concluded such testimony was deliberately evasive, and Rosas's statement to Deputy Glasgow identifying defendant as the "triggerman" was inconsistent. (See *People v. Green* (1971) 3 Cal.3d 981, 987–989 [where witness testified to events leading up to his possession of marijuana but denied recalling whether defendant provided it, his testimony was "deliberate evasion" that "constitute[d] an implied denial" defendant furnished him with marijuana, which was inconsistent with witness's out-of-court statements in which he identified defendant as his supplier]; see also *People v. Cowan*, *supra*, 50 Cal.4th at p. 463 ["a witness's deliberate evasion of questioning can constitute an implied denial that amounts to inconsistency, rendering a prior statement admissible under Evidence Code section 1235"]; *People v. Johnson* (1992) 3 Cal.4th 1183, 1219–1220 ["When a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied. [Citation.] As long as there is a reasonable basis in the record for concluding that the witness's 'I don't remember' statements are evasive and untruthful, admission of his or her prior statements is proper"]; *People v. Gunder* (2007) 151 Cal.App.4th 412, 419–420

[witness's extrajudicial statement admissible as inconsistent statement and did not violate defendant's right to confrontation where witness was subject to cross-examination and trial court reasonably determined witness's forgetfulness at trial was feigned].) On this record, we cannot conclude the trial court abused its broad discretion in admitting Deputy Glasgow's testimony regarding Rosas's out-of-court statement.

### 3. *Any alleged error was harmless beyond a reasonable doubt*

Importantly, irrespective of whether it was error to admit the testimony regarding Rosas's out-of-court statement, any alleged error was harmless beyond a reasonable doubt. Here, the evidence against defendant was strong. There was evidence from which the jury could conclude defendant himself admitted to Deputy Sanchez his involvement in the incident, that he shot the victim, and that he subsequently acknowledged his confession and emphasized it took him a lot of "nerve" to call Deputy Sanchez. There was also the independent testimony of Tori who testified defendant told her about his involvement in the home invasion and that he shot the victim because he wanted to know what it felt like to kill someone.

Accordingly, there was significant other evidence upon which the jury could rely to conclude defendant was involved in the charged offense and that he shot the victim. Thus, we conclude any alleged error in admitting Rosas's out-of-court identification of defendant as the "triggerman" was harmless beyond a reasonable doubt. (Compare *Douglas*, *supra*, 380 U.S. at p. 419 [defendant's inability to cross-examine witness about alleged confession amounted to reversible violation of confrontation clause where confession was the only direct evidence defendant fired shotgun and "formed a crucial link in the proof"] and *People v. Shipe* (1975) 49 Cal.App.3d 343, 351, 355 [reversing defendant's conviction where court could not conclude prosecutor's "flagrantly suggestive" questions in the face of witness's repeated refusals to answer did not contribute to verdict where evidence of defendant's guilt was "entirely circumstantial"]

18.

with *People v. Morgain* (2009) 177 Cal.App.4th 454, 465–466 ["in stark contrast to both *Shipe* and *Douglas*—there was independent evidence of appellant's guilt"]; see generally *Chapman v. California* (1967) 386 U.S. 18, 21–22.)

## DISPOSITION

The judgment is affirmed.


                                                                    PEÑA, J.

WE CONCUR:


POOCHIGIAN, Acting P.J.


DE SANTOS, J.

19.