Filed 11/12/25  P. v. Peterson CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B331774 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. BA490599 |
| DAYSTAR PETERSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, David V. Herriford, Judge.  Affirmed.

The Baez Law Firm, Jose Baez, Laura L. Cepero; Unite the People and Crystal Morgan for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Zee Rodriguez and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

In December 2022 a jury convicted Daystar Peterson of assault with a semiautomatic firearm on Megan Pete, carrying a concealed unregistered firearm in a vehicle, and discharging a firearm with gross negligence. The court sentenced Peterson to 10 years in the state prison. On appeal, Peterson contends the trial court committed a number of errors. We find no prejudicial error and, accordingly, affirm Peterson's conviction.

## FACTS AND PROCEDURAL BACKGROUND

### *Peterson fires five shots at Pete, striking her in the feet*

On July 12, 2020, Pete went to a gathering at Kylie Jenner's house. At some point, Pete texted Peterson and "told him to come." When Peterson arrived, it was "really late." Eventually, Pete wanted to leave. Pete, her friend and personal assistant Kelsey Harris, and Peterson got in an SUV driven by Peterson's driver, Jauquan Smith. An argument started about the relationships among Pete, Harris, and Peterson.

Pete asked to be let out of the SUV. Pete got out and started walking away. She heard Peterson say, " 'Dance, bitch.' " Pete turned her head a little bit and saw Peterson pointing a gun at her. She froze. Pete heard shots. She looked down at her feet and saw "all the blood."

Pete dropped to the ground and crawled into a driveway. Pete felt pain in both her feet. After that, "[i]t [got] blurry." Pete saw Peterson and Harris walking toward her. Peterson "started apologizing." Pete got back into the SUV. They heard police sirens and Peterson told Pete and Harris, " 'Please, y'all, don't say anything. I'm about to sign a big deal. I'll give both of you a million dollars each.' " At 4:27 a.m., Harris sent a text to Justin

Edison, who handled Pete's security. The text said, " 'Help.  Tory shot Meg.  911.' "[1]

Police stopped the SUV.  They asked everyone to get out. Pete told the police she'd stepped on glass.  She didn't tell them she'd been shot.  When asked at trial why she told the police she'd stepped on glass, Pete referred to the then-recent murder of George Floyd.  Pete testified she didn't "know if they're going to shoot first and ask questions later," and she didn't "feel safe with the police officers."

Officers found a 9mm Luger semiautomatic handgun on the floorboard of the front passenger seat.  The gun was in the slide lock position, meaning all the rounds had been fired from the magazine.  It was warm to the touch, even though it was cold outside at that hour of the morning.  Officers also found a bloody towel in the backseat.

The officers took Peterson, Harris, and Smith into custody. At the station, officers checked the hands of all three for gunshot residue.  The samples taken from Peterson and Harris were positive for gunshot residue.  A criminalist testified at trial that, if Harris had been standing "within feet of an individual firing a firearm and came into contact with that individual after he fired a firearm," she would not be surprised if Harris tested positive for gunshot residue.  No gunshot residue particles were detected on the sample taken from Smith.

An ambulance took Pete to the hospital.  Neither in the ambulance nor at the hospital did Pete tell the medical providers that she'd been shot.  She later explained, "[I]n the Black

---

[1]     Peterson, a rap artist, performed as Tory Lanez.  The record reflects friends also called him Tory.

3

community, . . . it's not really acceptable to be cooperating with police officers." Pete also said that, when a woman accuses a man of something, "people have a hard time believing you." She added, "This whole situation in the industry, like a big boys' club. Like, I'm telling all of y'all's friends, and now everybody about to hate me."

Around 9:05 the morning of the shooting, Peterson called Harris from jail. A recording of the call was played for the jury. Harris told Peterson that Pete was still in the hospital and she was waiting outside. Peterson said,

> "I know she probably never ever gonna ever talk to me ever again, but bruh I just want you to know bruh, n***a I was just so fucking drunk. . . . I never do some shit like that bruh. . . . [Y]ou know regardless that's not gonna make anything right, and that's not gonna make my actions right bro, but I'm just deeply sorry bruh. . . . So, like I feel crazy bruh, but made a mistake like, what happened, happened already bruh. I can't take it back bruh. . . . I'm just telling y'all I'm sorry bruh."

At 8:59 p.m. that evening, Peterson texted Pete. The text said,

> "Meg I know u prolly never gone to talk to me again[.] But I genuinely want u to know I'm sorry from the bottom of my heart[.] And I was just too drunk. None the less shit should have never happened and I can't change what I did. I just feel horrible[.] Cuz I genuinely just got too drunk. I love u and I hope ur okay."

4

Peterson sent Pete other text messages "just apologizing."

Pete had bullet fragments in both of her feet. She had to have surgery and physical therapy. Pete "couldn't walk for a while." She "can't really feel the left side of [her] foot."

About four days after the shooting, Pete told police who had shot her. Pete testified she'd "had a change of heart" because Peterson "had tried to start getting ahead of the story" online; he'd "put it on a bunch of different narratives about what happened."

DNA testing of the Luger revealed a profile of at least four people. Peterson could not be excluded or included. His "contribution" was "inconclusive." DNA testing of the magazine also revealed a profile of at least four people. Peterson was not one of them. No usable fingerprints were found on the gun or the magazine.

In response to the prosecutor's questions at trial, Pete testified she was "having a really difficult time sitting up [there] and trying to comfortably tell [her] story." Apparently referring to spectators in the courtroom, Pete said "a group of people [had been] continuously spreading misinformation to make her look like a bad person."

### *The charges, trial, and verdicts*

The People charged Peterson with assault with a semiautomatic firearm on Pete (count 1), having a concealed firearm, not registered to him, in a vehicle (count 2), and discharge of a firearm with gross negligence (count 3). In count 1 the People alleged Peterson personally used a firearm. In counts 1 and 3, the People alleged Peterson personally inflicted great

bodily injury on Pete.  The People also alleged aggravating factors under the California Rules of Court.[2]

The case went to trial in December 2022.  Among other witnesses, the defense called Sean Kelly.  Kelly testified he lived near Nichols Canyon.  In July 2020[3] Kelly was asleep.  He was awakened by "lots of shouting and voices."  He looked through his window and saw "two girls arguing."  Then they "started fighting."  They were "pulling their hair" and "hitting each other."  "It was quite violent."  A tall man got out of the driver's side of the "car" and "got involved" in the fighting.

One of "the girls" went to the car.  Kelly then heard what at first he thought were fireworks.  He saw a muzzle flash.  At "[a]bout the same time," a "smaller gentleman" got out of the back passenger seat.  "He was shouting a lot."  Kelly "saw more flashes" and "what was, obviously, gunfire."  The muzzle flash was near "the girls."

Kelly did not hear anyone say, " 'Dance, bitch.' "  Although both defense counsel's questions and Kelly's answers were unclear, Kelly seemed to say the "girl" "who was the aggressor" went to the car and he saw the muzzle "flashes coming from" her "hand."  Kelly then said "the flashes came from" the shorter man.

---

[2]     About two weeks into the trial, near the end of the People's case, the prosecution moved to add two more felony counts to the information for dissuading two witnesses (Pete and Harris) under Penal Code section 136.1.  The court denied the motion.

References to statutes are to the Penal Code unless otherwise noted.

[3]     Counsel didn't ask Kelly about a precise date, referring only to "an incident that took place in July of 2020."

6

Kelly testified, "I believe I saw the girl shoot first." "They were both shooting." Kelly never saw a gun. He called 911.

On cross-examination, Kelly admitted he'd told investigators that "the short guy came out of the car" and " 'then he shot the girl.' " The "girl" then "fell into the road and started bleeding." When asked, "[W]hat was he saying at that time?" Kelly replied, "A torrent of abuse." "It was all just n-words. And, you know, eff—mother-effer and . . . ." Kelly also admitted he'd never mentioned "a girl involved in the shooting to the 911 operator." Nor did he mention a female shooter to the responding officer.

Peterson chose not to testify.

The jury convicted Peterson on all three counts and found the firearm and great bodily injury allegations true. Peterson, represented by new counsel, filed a motion for a new trial. The court conducted a lengthy hearing on the motion over several days. The court ultimately denied the motion.

The court conducted a bench trial on the factors in aggravation under the California Rules of Court.[4] The court found true aggravating factors that Peterson used a weapon in the commission of the crime and that the victim was particularly vulnerable. (See rule 4.421(a)(2), (3).) The court also found Peterson's "conduct toward the victim after the incident" to be an aggravating factor. The court listed "social media posts, releasing songs with lyrics directed toward the victim, attempts to dissuade or perhaps give money to her and the other witness,

---

[4]     References to rules are to the California Rules of Court. At the beginning of the trial, Peterson agreed to bifurcate trial on the factors in aggravation and to waive jury on those allegations.

[and] violating the protective order."[5]  The court stated, "I think this is a very significant aggravating factor in this case."  The court added, "[T]here were two times that he violated the protective order where the court had to step in and raise his bail."

The court found not true the prosecution's allegation that the crime involved a high degree of cruelty, viciousness, or callousness within the meaning of rule 4.421(a)(1).

---

[5]  The trial court increased Peterson's bail several times between his arraignment in November 2020 and trial in December 2022.  In August 2021, the court granted the prosecution's motion to increase bail.  As a condition of bail (at the new higher amount), the court ordered Peterson "not to attend or appear at events where Megan P. is scheduled to appear."  In April 2022, the parties again appeared before the court to discuss another motion the prosecution had filed to increase bail.  The prosecutor referred to a "music video where he's depicting violent imagery, coupled with look-alike's in the video of [Pete] and her boyfriend."  This apparently was a reference to a music video Pete mentioned in her testimony at trial showing Peterson "chopping up horse legs."  Based on the exhibits the prosecution presented, the court found Peterson in violation of both the protective order and the discovery order.  As a condition of bail (at the new higher amount), the court told Peterson, "Sir, . . . you are not to mention [Pete] in this case or anything about this case in any social media or any public statements either directly or indirectly."  In October 2022, the parties appeared before the court yet again on the prosecution's motion to set bail at "no bail."  The court denied that motion but ordered "electronic monitoring house arrest" for Peterson pending trial.  The record on appeal includes reporters' and clerks' transcripts of the bail proceedings but not the motions, opposition briefs, or exhibits filed in connection with them.

8

The court also found three mitigating factors: that Peterson had no prior record (or an insignificant record) of criminal conduct, that he had "actively participated in charitable or philanthropic causes," and that he did "not pose a significant risk of re-offending in a violent manner." (See rule 4.423(b)(1), (c).)

Before pronouncing sentence, the court heard from seven witnesses called by Peterson. The court also listed the authors of 76 letters it had received from Peterson's supporters. A prosecutor read aloud a letter written by Pete as a victim impact statement.

The prosecution asked the court to sentence Peterson to 13 years in the state prison. The court sentenced Peterson to 10 years. The court found the aggravating and mitigating circumstances were "a wash." The court selected the midterm of six years on count 1, assault with a semiautomatic firearm. The court also chose the midterm of four years for the firearm enhancement. On count 2—carrying a concealed unregistered firearm in a vehicle—the court sentenced Peterson to the midterm of two years to be served concurrently with count 1. The court stayed under section 654 the sentence on count 3, discharge of a firearm with gross negligence. As to both counts 1 and 3, the court dismissed the great bodily injury enhancement under section 1385, subdivision (c)(2), presumably in accordance with Senate Bill No. 81 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1).

## DISCUSSION

### *The trial court did not abuse its discretion in permitting the prosecutor to ask Pete questions directed to her inconsistent reports to police and her attitude about the case and about testifying*

Peterson contends the trial court abused its discretion in "allowing testimony and evidence concerning Pete's emotions about the incident and its aftermath." On direct examination, the prosecutor asked Pete questions about her initial statements to law enforcement and medical personnel that she'd cut her feet on glass. Pete responded that, when a woman says a man did something to her, "people have a hard time believing you." Pete said she never wanted to come forward: "I didn't want to say nothing in the first place." Defense counsel objected to nine questions along these lines. The court overruled five of the objections and sustained four.

On cross-examination, defense counsel repeatedly asked Pete if she had lied:

> "Q: You also on CBS were asked a couple of times if you had some type of sexual relationship with my client; correct? [¶] . . . [¶]
>
> "A: Yes.
>
> "Q: And you lied; correct?
>
> "A: Yes.
>
> "Q: You lied on national TV; correct?
>
> "A: Yes.
>
> "Q: You also lied to the prosecutors; correct?
>
> "A: Yes.

10

"Q: You also lied to Detective Stogner about this issue about the relationship; correct?

"A: Yes."

On redirect, the prosecutor asked Pete questions that were follow-ups to areas defense counsel had raised. Pete testified "people" had been "making up things and putting out different stories that weren't true, saying that I had never been shot at all." So, Pete continued, "I had to come out and say 'Yes, I was shot. I didn't just step on glass.' I should have told the truth, initially. I know that now. And I thought I was trying to protect people. I thought I was doing the right thing. I thought I was protecting myself. But in the long run, I wasn't."

Relevant evidence is evidence having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action. (*People v. Hardy* (2018) 5 Cal.5th 56, 87 (*Hardy*); accord, *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 822.) Even if evidence is relevant, Evidence Code section 352 gives the trial court discretion to exclude it if its probative value is substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice. (*People v. Thomas* (2012) 53 Cal.4th 771, 806.) The prejudice that exclusion of evidence under section 352 is designed to avoid " ' "is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." ' " (*People v. Lopez* (2021) 65 Cal.App.5th 484, 504; *People v. Jones* (2017) 3 Cal.5th 583, 610.) The "prejudice" that section 352 refers to is evidence that " ' " 'uniquely tends to evoke an emotional bias against the defendant as an individual and [that] has very little effect on the issues.' " ' " (*Lopez*, at p. 504.)

11

" 'In general, the trial court is vested with wide discretion in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value.  Its rulings will not be overturned on appeal absent an abuse of that discretion.' " (*Hardy*, *supra*, 5 Cal.5th at p. 87.)  A trial court abuses its discretion when its decision " 'exceeds the bounds of reason' " or is " 'arbitrary, capricious, patently absurd, or even whimsical.' " (*Doe WHBE 3 v. Uber Technologies, Inc.* (2024) 102 Cal.App.5th 1135, 1150.)  Put another way, " '[a] ruling that constitutes an abuse of discretion has been described as one that is "so irrational or arbitrary that no reasonable person could agree with it." ' " (*Ibid.*; see also *People v. Lamb* (2024) 16 Cal.5th 400, 424 [under abuse of discretion standard, appellate court will not disturb the trial court's ruling unless it was arbitrary, capricious, or made in a patently absurd manner that resulted in a manifest miscarriage of justice].)

Peterson contends the prosecutor's question to Pete regarding "how [she] felt about coming into court today" was improper, and the trial court permitting it was "inexplicabl[e]." Peterson is mistaken.  The court instructed the jury—as courts do in every criminal trial—on a nonexclusive list of 11 factors jurors "may consider" in "judg[ing] the credibility or believability of the witnesses."  (CALCRIM No. 226.)  One of those factors is, "What was the witness's attitude about the case or about testifying?" (*Ibid.*)  Other factors include "Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?" and "Did the witness admit to being untruthful?" (*Ibid.*)  Pete's credibility was a key issue in the case.  Indeed,

in cross-examination Peterson's counsel repeatedly asked Pete to admit she'd lied.[6]

Peterson also asserts this testimony was "irrelevant and prejudicial" because it "elicit[ed] sympathy for the victim." However, at the outset of the trial, the court instructed the jury, "Your verdict must be based only on the evidence presented during trial in the court and the law as I provide it to you." The court also told the jury, "Do not let bias, sympathy, prejudice, or public opinion influence your decision." And before closing arguments, the court again instructed the jurors, "You must not let bias, sympathy, prejudice, or public opinion influence your assessment of the evidence or your decision." "We presume that the jury understood and followed the court's instructions in reaching its verdict." (*People v. Love* (2025) 107 Cal.App.5th 1280, 1290; *People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

### *Evidence Code section 352.2 does not apply retroactively, and the trial court did not abuse its discretion in admitting a photograph of Peterson's torso and arms*

Peterson contends the trial court "reversibly erred in admitting evidence of Peterson's creative expression"— specifically, a photograph that showed tattoos on his torso and arms. At trial, Officer Sandra Cabral testified she and her

---

[6] Pete's testimony about being "hat[ed]" on social media for having come forward also was relevant to her "attitude about the case or about testifying." When asked, "What are some of the things that you were seeing and how did that affect how you felt about coming into court today?", Pete replied, " 'Megan shoulda been shot and killed. I woulda shot the bitch, too. That bitch lying. Hoes always doing shit like this. Who cares. She fucked everybody. She shoulda been shot.' "

13

partner stopped a vehicle that matched the description of a vehicle in a radio call they'd received. Four people—later identified as Peterson, Pete, Harris, and Smith—were in the vehicle. An ambulance took Pete away and Cabral and her partner arrested the other three and took them to Hollywood station "for further questioning." As the officers had found in the vehicle a handgun that was "warm to the touch" and "in the slide locked position," when they got to the station they tested Peterson, Harris, and Smith for gunshot residue.

The prosecutor marked as exhibits three photographs taken at the station that depicted Peterson, Harris, and Smith respectively. In a photo marked as Exhibit 18, Peterson appears to be wearing black shorts or swim trunks; he is shirtless and tattoos on his chest and arms are visible. In a photo marked as Exhibit 19, Harris appears to be wearing a black two-piece swimsuit; tattoos are visible on her arms and left thigh. In a photo marked as Exhibit 20, Smith appears to be wearing black pants and a long-sleeved black top. At sidebar, Peterson's counsel objected to the photograph, arguing it was irrelevant and would "only sway the jury," because "[it] looks like he's got tattoos." The court replied the photos were "to show who the people are that she [referring to Officer Cabral] took the swab[s] from." The court continued, "I don't see anything wrong. He has no shirt on. He has tattoos. Other than that, what's wrong with the picture."

At the conclusion of the evidence, the court discussed the exhibits with counsel. When the court asked defense counsel if he had any objection to the admission into evidence of Exhibits 18, 19, or 20, he replied, "No, Your Honor."

14

In support of his claim of reversible error, Peterson cites Evidence Code section 352.2. Assembly Bill No. 2799 (2021–2022 Reg. Sess.) (Stats. 2022, ch. 973, § 2) enacted that statute, which took effect on January 1, 2023. (Evid. Code, § 352.2; *People v. Aguirre* (2025) 18 Cal.5th 629, 725 (*Aguirre*); *People v. Ramos* (2023) 90 Cal.App.5th 578, 580 (*Ramos*), review granted July 12, 2023, S280073.) The statute requires trial courts to consider certain factors when "a party seeks to admit as evidence a form of creative expression" "[i]n any criminal proceeding." (Evid. Code, § 352.2, subd. (a).) The statute defines " 'creative expression' " as "the expression or application of creativity or imagination in the production or arrangement of forms, sounds, words, movements, or symbols, including, but not limited to, music, dance, performance art, visual art, poetry, literature, film, and other such objects or media." (Evid. Code, § 352.2, subd. (c).)

Peterson cites *People v. Venable* (2023) 88 Cal.App.5th 445, review granted May 17, 2023, S279081. In *Venable*, the court of appeal held Evidence Code section 352.2 applies retroactively to cases that are not yet final. (*Venable*, at p. 448.) In his opening brief, Peterson failed to note that our Supreme Court had granted review in *Venable* (S279081) some nine months earlier. Peterson also failed to cite either of the two cases that reached the opposite conclusion: *People v. Slaton* (2023) 95 Cal.App.5th 363, 375, review granted November 15, 2023, S282047, and *Ramos, supra,* 90 Cal.App.5th at pp. 590–596, review granted July 12, 2023, S280073. In his reply brief, Peterson acknowledged the grant of review and mentioned *Slaton*. Peterson stated he "relie[d] on his previous argument" pending "a final outcome" in the high court.

On August 28, 2025, our Supreme Court held in *Aguirre*, *supra*, 18 Cal.5th 629, that Evidence Code section 352.2 does not

apply retroactively.  (*Aguirre*, at pp. 683, 687–693.)  *Aguirre* involved handwritten rap lyrics and instant messages attributed to the defendant.  (*Id*. at pp. 653–655, 683–686.)  Chief Justice Guerrero explained that the high court, having "[e]xamin[ed] the language of Evidence Code section 352.2 and its uncodified legislative findings," saw "nothing that 'clearly and unavoidably' [citation] reveals an intent to depart from the general rule of prospective-only application."  (*Id*. at p. 690.)  Accordingly, Evidence Code section 352.2 does not assist Peterson.

In any event, the record does not support Peterson's contention that Exhibit 18 "inject[ed] racial bias into the proceedings."  The prosecution did not offer the photograph as evidence of any alleged gang affiliation.  There was no gang allegation in this case and no one ever suggested that Peterson had any gang ties.  The prosecution offered Exhibit 18 (and Exhibits 19 and 20), and the court admitted them into evidence, solely to show the identity of the individuals officers swabbed for gunshot residue at the police station.

The record does not reflect whether Peterson was wearing a shirt when police stopped his vehicle.  Pete testified they'd just emerged from the swimming pool.  She was wearing a bikini and Harris "was in a swimsuit, too."  Pete's stylist Eric Culberson— called by the defense—also testified both Pete and Harris were wearing swimsuits when they got into the SUV.  Culberson also testified Peterson was wearing "drawers" when they left Jenner's house.  In his closing argument, Peterson's counsel referred to what Peterson was wearing as "his trunks."  There was no testimony at trial that Peterson had been wearing a shirt and the officers asked him to remove it in order to swab his hands for gunshot residue or to take his photograph.

Peterson asserts "the prosecution **explicitly** and improperly introduced racial bias into the proceedings" by asking a witness about what appears to be a tattoo of a firearm in the middle of Peterson's chest. Defense witness Culberson testified he was Pete's "stylist and friend"; he sometimes was Pete's driver as well. From the questioning, it appears the defense called Culberson to ask him if Pete or Harris had had a gun in their luggage. On direct examination, defense counsel also asked Culberson if he'd "ever seen Tory with a gun." Culberson replied, "No." Counsel asked if Peterson "[ran] around with guns." Culberson answered, "No."

On cross-examination, the prosecutor asked Culberson a series of questions about whether he'd ever seen Harris with a gun and whether he'd seen Pete with a gun "at any time that day or night." He did not ask Culberson if he had ever seen Peterson with a gun. On redirect, defense counsel then asked Culberson if he'd ever seen Peterson with a gun, if he'd ever seen Peterson "have a bag that had some weapons with him," and whether he'd ever "seen [Peterson] discuss anything about firearms [*sic*]." Culberson answered "no" to those questions.

On recross-examination, the prosecutor and Culberson had the following exchange:

> "Q: Now, counsel asked you if you've ever seen Tory talk about guns or if you've ever seen him with guns; do you recall that?
> "A: Yes.
> "Q: Do you see the big gun that Tory has tattooed on the center of his chest?
> "A: No. I haven't seen Tory's body."

Defense counsel did not object to that question.

In short, the record does not support Peterson's contention that "prosecutors utilized Peterson's tattoo, which is intertwined with his rapper persona, to lead jurors . . . [to conclude] he is a violent criminal with a predisposition to commit crimes." It was *defense* counsel who asked—both on direct and on redirect—if Culberson had ever seen Peterson with a gun. Neither of the prosecutors even mentioned Peterson's tattoos—much less the tattoo of a firearm—in their closing arguments.

Peterson also complains that Pete's testimony about a music video Peterson had released "poisoned the proceedings by directing the jury to infer that if Peterson was 'chopping up horse legs' in a music video, he was violent enough to shoot her." Peterson seems to be referring to Pete's answer to the prosecutor's question about whether she regretted having come forward: "If I would have known that coming out and speaking my truth would come with people agreeing with me being shot, if I would have known, I would have started to lose my confidence. Lose my friends. Lose myself. I didn't ask for this. I didn't want to come out about it in the first place. I started to feel like, 'Damn, maybe I should be dead.' I got to watch Tory drop music videos chopping up horse legs and people laughing at it, like that's okay." Defense counsel did not move to strike Pete's reference to the music video.

No such music video was offered into evidence or shown to the jury. In any event, Pete's brief reference to the video—which she took as directed at her or even as a threat—was permissible for the same reasons we've already discussed: it's relevant to Pete's attitude about the case or about testifying.

18

***The trial court did not "impermissibly chill[] Peterson's right to testify" and—as Peterson did not testify—he cannot raise this issue on appeal***

Peterson asserts, "The jury did not hear Peterson's account regarding the night in question because the court ruled that, if he testified, prosecutors could introduce his music video and rap lyrics during cross-examination." Peterson mischaracterizes the record.

Midway through the defense case, the prosecutor told the court he was "asking" to "inquire about prior acts of violence" if Peterson testified, "to rebut the character evidence put on by the defense." The court replied, "Well, I think the state of the evidence as it is now, I would not allow that. Of course, I don't know what he would say if he testifies. It may become relevant depending on what he were to say. But at this point, I will exclude that."

The prosecutor listed a number of items with which he proposed to impeach Peterson, including "social media posts," "rap lyrics," "Instagram posts," a 2019 Miami incident, a 2022 incident with August Alsina,[7] an "incident with 'Love & Hip Hop' star, Prince, at a Florida nightclub," and more. The court stated, "[S]ome of this would be admissible, those portions that pertain to this case. Some wouldn't." The court continued, "[T]he best I can tell you at this point is if your client testifies I'll have to take it on a case-by-case basis. But, essentially, anything pertaining

---

[7]     Alsina is a singer-songwriter. The prosecution alleged Peterson—"wearing heavy rings on his fingers"— had "punched" Alsina "without warning" on September 17, 2022 in Chicago, knocking him to the ground and "[b]loodying him."

to this case, obviously, is fair game. If it pertains to some other incident, maybe it is. Maybe it isn't. It depends."

After the defense had called seven witnesses, the following exchange took place:

> "The Court: So, Mr. Mgdesyan, you've advised me that your client has elected not to testify.
>
> "Mr. Mgdesyan: That's correct, Your Honor.
>
> "The Court: So, Mr. Peterson, you know you have the absolute right to testify, if you choose. [¶] You have the absolute right not to testify, if that's your decision. [¶] If you testify, you will take the stand and be questioned just like all the other witnesses were by both sides. [¶] If you choose not to testify, I will instruct the jury not to consider it or not to hold it against you. [¶] Do you understand what I told you so far?
>
> "Mr. Peterson: Yes, Your Honor.
>
> "The Court: Have you had a chance to discuss that decision with your attorney?
>
> "Mr. Peterson: I have, Your Honor.
>
> "The Court: And based on your discussion, is it your choice at this point not to testify?
>
> "Mr. Peterson: I will not testify."

Neither Peterson nor his counsel ever told the court that Peterson wished to testify, but was deterred by the prospect of impeachment by the prosecution.

In *Luce v. United States* (1984) 469 U.S. 38 (*Luce*), the Supreme Court considered a case—like this one—in which a defendant did not testify and then argued on appeal the court had abused its discretion in denying his motion in limine to

preclude the prosecution from asking about a prior conviction. (*Id*. at pp. 39–40.) The Court stated, "A reviewing court is handicapped in any effort" to determine if a trial court performed the necessary balancing, because—to conduct that review—"the court must know the precise nature of the defendant's testimony, which is unknowable when, as here, the defendant does not testify." (*Id*. at p. 41.) In *Luce*, as here, "[t]here was no commitment by [the defendant] that he would testify if [his request to exclude possible impeachment] were granted, nor did he make a proffer to the court as to what his testimony would be." (*Id*. at p. 39.)

Moreover, "a reviewing court cannot assume that the adverse ruling motivated a defendant's decision not to testify." (*Luce, supra,* 469 U.S. at p. 42.) And, "[e]ven if these difficulties could be surmounted, the reviewing court would still face the question of harmless error." (*Ibid*.) The Supreme Court concluded, "The careful weighing of probative value and prejudicial effect . . . require[d] of a [trial] court can only be evaluated adequately on appeal in the specific factual context of a trial as it has unfolded." (*Id*. at p. 43 (conc. opn. of Brennan, J.); see also *People v. Collins* (1986) 42 Cal.3d 378, 385 [adopting *Luce* rule]; *People v. Duong* (2020) 10 Cal.5th 36, 56–57 [" 'It is well established that the denial of a motion to exclude impeachment evidence is not reviewable on appeal if the defendant subsequently declines to testify.' "].)

The *Luce* Court's reasoning is directly on point here. Peterson argues *Luce* does not apply because (1) that case involved possible impeachment with a prior criminal conviction, and (2) Evidence Code section 352.2 would have required the court to exclude all of the possible impeachment evidence.

We are not persuaded. Nothing in *Luce* suggests its holding is limited to impeachment with a prior conviction as opposed to other types of conduct or acts. And, as we have said, Evidence Code section 352.2 "does not guide us in this appeal." (*Aguirre*, *supra*, 18 Cal.5th at p. 693.)

### *The mention of Peterson's criminal case in Florida was not prejudicial*

Peterson asserts, "Inculpatory statements, which were inculpatory as to the shooter's identity, were improperly introduced in spite of their factual falsity." Peterson apparently is referring to Pete's testimony that, shortly after the shooting, when she and the others heard police sirens and Peterson offered her and Harris a million dollars, Peterson said, "I can't go to jail. I already got caught with a gun before. Don't tell on me." A few questions later, the prosecutor asked Pete, "What's he saying exactly?" Pete replied, " 'I'll give y'all a million dollars if you don't say anything. I can't go to jail no more. I'm already on probation.' "

In the defense case, Peterson's counsel recalled the lead detective, Ryan Stogner. Counsel questioned Stogner about his interview of Pete after the shooting. Counsel asked if Pete had told him "that [Peterson] stated, 'Please don't say anything because I'm on probation.' " Stogner began to answer, "It was something to that—" when the prosecutor objected. The court overruled the objection. This exchange followed:

> "Q: Sir, did you do any investigation afterwards to find if my client was on probation at the time this case was happening in July of 2020?
> "A: Yes.

22

"Q:  Was my client on probation, sir?

"A:  No.  Not to my best recollection, sir."

After defense counsel asked Stogner about probation, the prosecutor began to ask a question about it.  Defense counsel objected.  At sidebar, the prosecutor told the court, "Mr. Lanez was actually on a Florida Miami probationary term that started in 2017."  She added that, even if that were not the case, defense counsel was accusing the victim of lying about what Peterson had said.  Defense counsel stated Peterson "got arrested in the Miami case but was never charged."

Outside the jurors' presence, the court and counsel discussed the matter at some length.  The prosecutor told the court, "The defendant was ordered diversion [*sic*] for a gun possession in 2017.  He released an Instagram live video where he talks about going to his probation officer."  After more discussion, the court stated, "I will allow you to inquire that there was an incident in 2017.  He was placed on court diversion.  Don't mention what the arrest was for.  And we'll leave it at that."

Later, defense counsel and the prosecutor stipulated to advise the jury that Peterson "was ordered a grant of diversion for a criminal case in 2017 and that diversion was terminated in April of 2017."  The court told the jury the stipulation meant "that is a fact that's not in dispute in this case" and they were "to accept that as conclusively proven."

Both counsel also agreed to a special jury instruction about diversion.  In accordance with that agreement, the court instructed the jury about the nature of diversion.  The instruction stated, "Diversion and probation are not the same. [¶] You are not to speculate about the circumstances of Mr. Peterson's grant of diversion in 2017. [¶] It was terminated in 2017. [¶] And you

23

are not to conclude from this evidence that Mr. Peterson has a bad character or that he's disposed to commit crime."

Thus, after the prosecution asked Pete about Peterson's statements, defense counsel raised the issue of "probation" with the detective in an effort to show Pete lied to the police. Pete's testimony that Peterson said he'd been "caught with a gun before" was not false. In any event, Peterson's counsel reached an agreement with the prosecution to present a stipulation with the true facts to the jury, and for the court to instruct the jury on what "diversion" means. The record does not support Peterson's claim of error on this point.

### *The trial court did not err in permitting the prosecution to play for the jury, as a prior inconsistent statement, the recording of Kelsey Harris's interview with prosecutors*

Peterson contends the trial court "reversibly erred" in permitting the prosecution to play for the jury its recorded interview with Kelsey Harris. Peterson relies on the confrontation clause and *Crawford v. Washington* (2004) 541 U.S. 36. Peterson is mistaken. The issue is one of admissibility under the Evidence Code. It does not involve the confrontation clause.

The prosecution subpoenaed Harris to testify at trial. The court had appointed counsel for Harris and the prosecution had granted her use immunity. Once on the stand, to say Harris was a reluctant witness is an understatement.

Harris repeatedly claimed not to remember what had happened that early morning and in the days following the shooting. To question after question, Harris replied she didn't remember, couldn't remember, or didn't know. She repeatedly said it was "a blur." Several times, Harris said she wanted to

24

"take [the] fifth." The court told her she had to answer the questions. Harris repeatedly said, "I don't want to be here."

In an attempt to refresh Harris's recollection, the prosecutor played excerpts of a recording of a September 14, 2022 interview. The two prosecutors had interviewed Harris in the presence of her husband and an investigator from the district attorney's office; two attorneys representing Harris were present on the phone. Again and again at trial, Harris told the prosecutor she'd have to refresh her recollection with the recording. Confronted with her prior inconsistent statements, Harris testified there were "some things [she] just wasn't being truthful about" in her interview.

Harris also testified she didn't remember telling prosecutors things that she can be heard saying in the recording. When asked if she had said in the interview that she'd seen Peterson "shooting through the window and to the top of the door," Harris replied, "Again, this is the night of alcohol. I don't, you know, I don't know. I don't know."

In light of Harris's claimed failure to recall what she'd told the authorities, and her testimony that she had been untruthful in some of her statements, the prosecution proposed to play the recorded interview for the jury. Citing Evidence Code sections 770 and 1235, the court said it would allow that. Section 770 generally governs the admissibility of "extrinsic evidence" of a witness's prior inconsistent statement for impeachment. The statute requires only that the witness be given an opportunity at some point in the trial to explain or deny the inconsistent statement. (Evid. Code, § 770, subd. (a).) Section 1235 provides, "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent

25

with his testimony at the hearing and is offered in compliance with Section 770." Where the out-of-court statement is inconsistent with the witness's trial testimony, the jury may consider the prior statement for its truth as well as for the light it sheds on the witness's lack of credibility. (See CALCRIM No. 318 [jurors may use witness's prior statement to evaluate witness's testimony and as evidence that information in earlier statement is true].) So the prior statement has a dual purpose: it may be considered for impeachment as well as substantive evidence.

When a trial court concludes, on substantial evidence, that a witness's professed lapses of memory are false, evasive devices to avoid truthful answers, it may admit as " 'inconsistent' " the witness's prior statements describing events the witness now claims to have forgotten. (*People v. Arias* (1996) 13 Cal.4th 92, 152; see also *In re Deon D.* (1989) 208 Cal.App.3d 953, 961–963.)

### *The trial court did not abuse its discretion in admitting evidence regarding an Instagram post*

Peterson contends the trial court "reversibly erred in admitting an allegedly inculpatory Instagram post which was disclosed to the defense in an untimely fashion, amounted to inadmissible hearsay, and was highly prejudicial thereby resulting in a manifest injustice." We do not agree.

After the jurors were selected on a Thursday, the court excused them so it could discuss various issues with counsel before opening statements, set to begin on Monday. During that discussion, the prosecutors told the trial court and defense counsel that they'd "just [been] made aware" of a September 2020 Instagram post "by the defendant" in which he said a comment posted by someone else that Harris shot Pete was "not true." The prosecutor gave "that information on a CD" to defense counsel,

who said he'd look at it, but he thought there might be "a foundation issue."

The following Tuesday, the prosecution filed a "motion to admit the defendant's statement on Instagram[.]" The prosecution attached to its motion a photograph of a post by "LilJuMadeDaBeat" that said, "This goofy a** ni**a[8] say he ain't shoot her and they literally have matched the bullets from his gun to the ones in her foot[.]" Below is the statement: "Liked by frostedcupkait and 281,393 others[.]" Next, by "theshaderoom": "#MeganTheeStallion's producer alleges that authorities have matched the bullets from #ToryLanez's gun to the ones found in her foot (See earlier posts)[.]" Under that: "View all 13,727 comments[.]" Next, "spliffkaay_" says "People saying Kelsey shot her [crying emoji][.]" Finally, a post by "torylanez @spliffkaay_" "that's not true[.]" The date on the posts is September 25, 2020.

Two days later, the court discussed the Instagram posts with counsel. Citing *People v. Valdez* (2011) 201 Cal.App.4th 1429 and *People v. Lee* (2022) 81 Cal.App.5th 232,[9] the court stated, "[I]f the People establish the requisite foundation; namely, that this account is linked to a certain individual, that goes more to the weight of the evidence than the admissibility."

Detective Warren Eberhardt then testified. Eberhardt stated he had "clicked on the torylanez hyperlink, and that

---

[8] The prosecution X'd out three letters in the post.

[9] Only portions of the *Lee* opinion were published. The part discussing the admissibility of Facebook and Instagram posts was not in the published portion. The *Lee* court cited other published opinions, including *People v. Goldsmith* (2014) 59 Cal.4th 258, 267.

27

directed [him] to an Instagram page where the user name was Tory Lanez." Eberhardt explained the "blue check" on the page was "essentially, a verification badge." Eberhardt testified the Tory Lanez account has 11.8 million followers. He noted photographs on the account appeared to depict Peterson.

On cross-examination, when asked, "Do public figures have people who run their Instagrams?", Eberhardt replied, "[T]hat's fair to say, yes." Eberhardt testified he'd "never said" Peterson made the post, adding he could "only testify to the user name of the account that the post came from." Eberhardt stated he did not know who was "controlling" Peterson's account. Defense counsel marked as Exhibit E and showed to Eberhardt an Instagram post apparently from user "@midjordan" replying to "@messiahcarey." The post states, " 'This is not real. Y'all want to believe anything. I am the only person with access to Tory's account at the moment.' " Defense counsel noted the post had been "liked" by "Tory Lanez." Eberhardt testified he'd never seen the post.

When the time came to discuss with counsel the admission of the exhibits, defense counsel said he objected to Exhibit 40A, the Instagram posts, and Exhibit 40B, photographs on the account, on "foundation." The court admitted the exhibits over counsel's objection. Defense counsel moved the admission of Exhibit E. The court stated it wasn't "sure any foundation was laid." The prosecution objected on that ground and the court sustained the objection. The court noted the exhibit's exclusion did "not preclude [defense counsel] from arguing that any post would have come from other people other than [Peterson]." And counsel did so.

28

On appeal, Peterson complains of late discovery. Counsel never made this objection during trial: he did not ask for a continuance, exclusion of the exhibit as a discovery sanction, or a jury instruction. It was not until Peterson filed his motion for a new trial that he first raised the issue. Peterson has forfeited the timeliness issue on appeal.

Peterson also asserts the Instagram posts are inadmissible hearsay. "A trial court's ruling on the admissibility of evidence, including 'on the hearsay nature of the evidence in question,' is reviewed for abuse of its discretion." (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 766.) We need not reach the question of any abuse of discretion here (and we see none in any event), because Peterson did not object to the exhibit's admission on this ground at trial; he raised it for the first time in his new trial motion.[10] Peterson's failure to object to the posts as hearsay at trial also forfeits that argument on appeal. (Evid. Code, § 353, subd. (a); see *People v. Demetrulias* (2006) 39 Cal.4th 1, 20–21 [judgment may be reversed because of erroneous admission of evidence only if an objection to the evidence was timely made and so stated as to make clear the specific ground of the objection].)

---

[10] Peterson filed a declaration of Joshua Farias with his motion. Farias declared he was "the manager of [Peterson's] Instagram account," and he was the person who "replied '@spliffkaay_ that's not true.'" Farias declared, "I never consulted with Mr. Daystar Peterson in posting that comment on September 25, 2020." In ruling on Peterson's new trial motion, the trial court stated the Farias declaration was not "newly discovered evidence." The court continued, "I think that's something that could have been discovered through reasonable means."

Finally, any error in admitting the Instagram post was harmless.  As the trial court noted, the Instagram post "was an extremely minor issue in the case."  The case turned on Pete's testimony, Peterson's admissions to Harris when he called her from jail, and other similar evidence.  Detective Eberhardt testified he was *not* saying that Peterson had posted the statement "that's not true," and he admitted he had no knowledge of who controlled Peterson's Instagram account.

### *The trial court properly instructed the jury on count 1 and the firearm enhancement; any error in the instructions on count 2 was harmless*

Peterson contends the trial court "reversibly erred" in its instructions to the jury on counts 1 and 2.  Count 1 alleged assault with a semiautomatic firearm in violation of section 245, subdivision (b), and count 2 alleged having a concealed unregistered firearm in a vehicle in violation of section 25400, subdivision (a)(1).  In count 1, the People also alleged Peterson personally used a firearm in the commission of the offense, within the meaning of section 12022.5, subdivisions (a) and (d).  At the conference on jury instructions, the trial court told counsel it would give CALCRIM No. 250, Union of Act and Intent: General Intent.  The court continued, "So all three crimes here are general intent crimes."  Defense counsel did not disagree or object.

Peterson's argument on appeal is somewhat difficult to understand.  He asserts assault with a semiautomatic firearm "is a general intent crime; yet, the enhancement attached to this count through Penal Code section 12022.5 requires specific intent."  Peterson does not cite any case in support of this contention.  No case has held that assault with a semiautomatic

firearm or a personal use of a firearm enhancement requires specific intent.

To prove assault with a firearm, the prosecution must prove (1) the defendant did an act with a firearm that by its nature would directly and probably result in the application of force to a person; (2) the defendant did that act willfully; (3) when the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; and (4) when the defendant acted, he had the present ability to apply force with a firearm to a person.  (CALCRIM No. 875.)

Thus, this instruction requires a defendant to have acted willfully and with awareness of facts that a reasonable person would recognize would result in the application of force to a person.  The jury instruction defines "willfully":  "Someone commits an act *willfully* when he . . . does it willingly or on purpose"—as opposed, for example, to accidentally.  (CALCRIM No. 875.)  The word " ' "willfully" ' " " 'implies simply a purpose or willingness to commit the act . . . .  It does not require any intent to violate law, to injure another, or to acquire any advantage.' " (1 Witkin, Cal. Criminal Law (5th ed. 2025) Elements, § 8(1) (hereafter Witkin), quoting Pen. Code, § 7(1).  See *People v. Atkins* (2001) 25 Cal.4th 76, 85 [" 'The word "willfully," when applied to the intent with which an act is done . . . implies simply a purpose or willingness to commit the act . . . .' " [¶] " 'Willfully . . . " 'implies that the person knows what he is doing, intends to do what he is doing and is a free agent.' " ' "].)  Similarly, the jury instruction for the personal firearm use enhancement requires

31

only that the defendant "personally used a firearm during the commission" of the offense.  (CALCRIM No. 3146.)

Peterson's contention regarding count 2 requires more discussion.  Peterson asserts, "Likewise, count 2 is a specific intent crime and required" instruction with CALCRIM No. 252.  That instruction is entitled, "Union of Act and Intent:  General and Specific Intent Together."  (CALCRIM No. 252.)  To prove the offense of carrying a concealed firearm within a vehicle, the prosecution must prove (1) The defendant carried within a vehicle a firearm capable of being concealed on the person; (2) The defendant knew the firearm was in the vehicle; (3) The firearm was substantially concealed within the vehicle; and (4) The vehicle was under the defendant's control or direction.  (CALCRIM No. 2521.)

Knowledge is not the same thing as specific intent.  (See 1 Witkin, *supra*, Elements, § 9(1) ["knowingly" merely requires proof of knowledge of facts that constitute the offense]; *People v. Calban* (1976) 65 Cal.App.3d 578, 584 ["A requirement of knowledge is not a requirement that the act be done with any specific intent.  [Citations.]  The word 'knowing' as used in a criminal statute imports only an awareness of the facts which bring the proscribed act within the terms of the statute."].)

However, knowledge *is* a required mental state for a violation of the statute.  For the first time in his reply brief, Peterson cites the Bench Note to CALCRIM No. 250.  The note states, "[T]his instruction **must not** be used if the crime requires a specific mental state, such as knowledge . . ., even if the crime is classified as a general intent offense. . . . [¶] If the case involves both offenses requiring a specific intent or mental state and offenses that do not, the court may give CALCRIM No. 252,

32

*Union of Act and Intent: General and Specific Intent Together*, in place of this instruction." (CALCRIM No. 250, Bench Notes, *Instructional Duty*.)

We review the adequacy of an instruction independently. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210 (*Cole*); *People v. Cooksey* (2002) 95 Cal.App.4th 1407, 1411.) From the bench note to CALCRIM No. 250, it appears the trial court should have given the jury CALCRIM No. 252, listing assault with a semiautomatic firearm and the firearm enhancement (as well as count 3, discharging a firearm with gross negligence) as requiring only general criminal intent, but listing carrying a concealed firearm within a vehicle as requiring the specific mental state of knowledge.

However, on this record, the court's failure to do so was harmless. " 'In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution.' " (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 497.) We review the challenged instruction in the context of the instructions as a whole and the trial court record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner. (*Ibid.*) "Instructional error requires reversal of the judgment only if it resulted in a miscarriage of justice, meaning it is reasonably probable the defendant would have fared better in the absence of the error." (*Ibid.*; Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

The trial court did instruct the jury that the prosecution was required to prove not only that Peterson committed the prohibited act but that he did so "with wrongful intent," and that

33

he "knew the firearm was in the vehicle." (CALCRIM Nos. 250, 2521, element 2.) In closing, the prosecutor argued Peterson "knew it [the gun] was there. Of course, he did. He grabbed it. He shot Megan with it." Defense counsel told the jurors, "My client didn't even know the gun was there." Counsel said Peterson "jumps in the seat after the girls are in the car." Counsel continued, "They're trying to say my client knows the gun was there and he touched the gun and he put the gun there." Why, then, counsel asked was his DNA not found on the gun.

In short, the jurors were well aware that the prosecution had to prove Peterson knew the gun was in the vehicle. " '[J]urors are presumed to be intelligent and capable of understanding and applying the court's instructions.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 926.) Reversal on count 2 is not required.

### *Any ambiguity in CALCRIM No. 3160 is harmless in this case*

On the allegations that, in committing the offenses in counts 1 and 3, Peterson personally inflicted great bodily injury on Pete, the trial court instructed the jury with CALCRIM No. 3160. The instruction states, "*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm." (CALCRIM No. 3160.) Peterson cites a bench note following the instruction that cautions courts, "Th[is] . . . sentence of the great bodily injury definition could result in error if the prosecution improperly argues great bodily injury may be shown by greater than minor injury alone." (CALCRIM No. 3160, Bench Notes.) The note cites *People v. Medellin* (2020) 45 Cal.App.5th 519, 533–535 [definition reasonably susceptible to prosecutor's erroneous argument

34

that the injury need only be greater than minor] and *People v. Quinonez* (2020) 46 Cal.App.5th 457, 466 [upholding instruction containing great bodily injury definition as written].

Any ambiguity in this definition is harmless in this case because substantial evidence established, beyond a reasonable doubt, that the injuries Peterson inflicted on Pete were more than moderate harm. Indeed, they are more properly characterized as significant or substantial harm. Pete had surgery to remove bullet fragments in both feet. She had a lot of pain and "couldn't walk for a while." Pete had physical therapy for "a few months."

The orthopedic surgeon who operated on Pete's feet testified at trial and the jury saw x-rays and a report of the operation. The surgeon told the jury Pete was placed under general anesthesia for the surgery. The surgeon described in detail the steps a team of three surgeons took to remove "questionable tissue" and the metal fragments, flush the areas, and close the wounds with sutures. Pete was admitted to the hospital after the surgery.

This testimony was more than sufficient to support the jury's finding that Peterson personally inflicted great bodily injury on Pete. (See *People v. Escobar* (1992) 3 Cal.4th 740, 749–750 [section 12022.7 does not require victim to have suffered permanent, prolonged, or protracted disfigurement, impairment, or loss of bodily function; abrasions and bruises to victim's legs, knees, and elbows, neck injury, and soreness in vaginal area that significantly impaired victim's ability to walk were sufficient]; *People v. Wolcott* (1983) 34 Cal.3d 92, 107–108 [victim was shot in leg; some bullet fragments lodged in victim's arms; little blood lost; no sutures used; victim treated at hospital, then released and went to work the next day]; *People v. Elder* (2014) 227

35

Cal.App.4th 411, 413, 415 [victim's finger got " 'pulled' " into defendant's hoodie and " 'snapped,' " dislocating finger].)[11]

### *The prosecutors' statements in closing argument do not require reversal*

Peterson contends the prosecution "engaged in prosecutorial misconduct in making improper comments during closing argument." According to Peterson, these "improper comments" consisted of "improper appeals to emotion and sympathy for the victim," arguing facts not in evidence, and "denigrat[ing] defense counsel."

Peterson implicitly acknowledges trial counsel did not object to any of the statements of which Peterson now complains. "[T]he general rule is that [a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion— and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Choyce* (2025) 18 Cal.5th 86, 113 (*Choyce*), citing *People v. Hill* (1998) 17 Cal.4th 800, 820.) Peterson cites a case for the proposition that this forfeiture rule does not apply "if an admonition would not have cured the harm." But he does not explain how admonitions here would not have cured any harm from the prosecutors' statements.

In any event, Peterson's claims of prosecutorial misconduct fail on the merits. " 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.' " (*Choyce*, *supra*, 18 Cal.5th at p. 114,

---

[11]    In any event, as noted, the court dismissed the great bodily injury enhancement at the time of sentencing.

quoting *People v. Morales* (2001) 25 Cal.4th 34, 44.) "In other words, the misconduct or error must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' " (*Choyce*, at p. 114, quoting *Cole*, *supra*, 33 Cal.4th at p. 1202.) "[E]ven if the misconduct is not so egregious as to render the trial fundamentally unfair, reversal is required if the prosecutor used 'deceptive or reprehensible methods to attempt to persuade either the court or the jury' that are reasonably likely to have affected the outcome of the proceeding." (*Choyce*, at pp. 114–115, quoting *People v. Cash* (2002) 28 Cal.4th 703, 733.)

As we have explained, the prosecution's questioning of Pete about why she initially lied to medical personnel and police, the criticism directed at her after she accused Peterson, and her attitude about the case and about testifying was not improper. Reference to that testimony in closing argument was not improper for the same reason.

As for the prosecutor's reference in his opening statement to what he expected Justin Edison to say if he testified, it is not uncommon for counsel—on both sides—to tell the jury that a particular witness will testify, only to be unable ultimately to procure that witness's appearance. With respect to the prosecutor's suggestion that Peterson tried to bribe Harris, and his question "Where is Justin, right?", Pete testified Peterson said, "Don't tell on me," and "I'll give y'all a million dollars if you don't tell on me" immediately after the shooting. Harris said the same thing in her September 2022 interview with prosecutors (though by the time of trial three months later she equivocated about why Peterson offered her the money). Harris also told prosecutors she'd met with Peterson outside a hotel a day or two after the shooting, and he asked her if she needed a job, if she

37

wanted to work with him. He also mentioned "invest[ing] into a business."

Prosecutors may argue inferences from the evidence. (1 Witkin, *supra*, Criminal Trial, §§ 788(1), 807(1) [citing cases].) "Prosecutors are granted wide latitude during arguments." (*People v. Henderson* (2020) 46 Cal.App.5th 533, 547.) When attacking the prosecutor's remarks to the jury, the defendant must show that, in the context of the whole argument and the instructions, there was a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. (*Id.* at p. 548.) Peterson has not made that showing here.

Finally, regarding Peterson's assertion that "[p]rosecutors denigrated [defense] counsel repeatedly throughout closing argument," this trial was vigorously litigated and hard fought. Both sides accused the other of misleading the jury. Defense counsel told the jury the prosecution's case was "full of holes" and the prosecutors had "the audacity" to ask the jurors to speculate. Counsel asked why the prosecution hadn't called Sean Kelly as a witness, or the investigating officer, Detective Stogner. Counsel queried why the prosecutor had objected to Kelly's testimony: "[B]ecause they didn't want you to know the truth?" Counsel asked, "Where is Jauquan [Smith]? Why didn't they call him?"[12]

---

[12] The record reflects the defense considered calling Smith as a witness but ultimately decided not to. At the outset of trial, defense counsel told the court the defense was "in the process of serving" Smith. Later, toward the end of trial, in a December 21, 2022, in camera proceeding, defense counsel told the court he had learned the day before that Smith may have been served "and may have been coming yesterday." Counsel continued,

Referring to himself, defense counsel asked the jury, "[W]ho told you the truth from the first day when I got up here and gave my opening statement?"  Counsel said, "From the opening statement

---

> "We had a lengthy discussion when I was informed of this over lunch with my client, my associate, and my investigator. [¶] We came to the conclusion that we're not gonna call him, because, obviously, his testimony is gonna be putting the gun in the hands of Kelsey.  And that's what he told all of us when we just did an interview upstairs. [¶] At this point my position was that the jury believes our theory.  I think Sean Kelly already put the gun in Kelsey's hand.  And if they're gonna believe that he took the gun from him and you started to shoot it yourself, to me it's kind of an absurd argument. Adding another person to say who has some connections to you as a security or a friend . . . isn't gonna do anything. [¶] So we decided we're not gonna call him this morning. . . . [¶] . . . [¶] I told the prosecution we won't call him. [¶] [I']ll just move forward into argument. [¶] I'm ready.  They're ready.  Let's just argue and instruct and be done with this."

Defense counsel explained further, "And the reason for that, Your Honor, is obviously with the holidays coming, my fear is first I'll lose this witness.  This witness made it very clear he's not gonna stay here . . . . [¶] Secondly, [and] more importantly, I think we'll have a mistrial and we're gonna lose jurors."  The court asked, "And you talked to your client or do you need to speak further to him?"  Counsel replied, "I've spoken to my client . . . . [¶] . . . [¶] [If the trial continues another seven days] [w]e'll have a mistrial.  My client definitely doesn't want that. [¶] My client wants closure on this.  He has family flying back out to Canada.  And he wants to finish this."

to every evidence [*sic*] they've introduced, ladies and gentlemen, they've tried to mislead you."

In sum, none of the prosecutors' statements constituted " 'deceptive or reprehensible methods' " that were "reasonably likely to have affected the outcome of the proceeding." (*Choyce*, *supra*, 18 Cal.5th at pp. 114–115.)

### The record does not support Peterson's contention that prosecutorial misconduct interfered with his "right to conflict-free counsel"

Peterson retained Shawn Chapman Holley to represent him in this case. Holley represented Peterson through the preliminary hearing as well as the extensive pretrial proceedings. According to Holley, with trial expected to begin in late November and December of 2022, Peterson wanted "to add another lawyer to the team"—George Mgdesyan. In a September 6, 2022 email, Holley explained to Bryan Gott—who appears to have been Peterson's business manager—"Tory has known him for a long time and trusts him."

Holley was engaged in an arbitration out of state that began in May 2022. It did not conclude until December 16, 2022 —nearly two weeks after trial commenced. In a letter dated January 10, 2023, to the trial court, Holley referred to this other engagement and explained, "Mr. Peterson understood and agreed that George Mgdesyan would represent him at trial and that I would not."

An email Peterson attached to one of his pleadings in connection with his motion for a new trial reflects a second reason Holley did not represent Peterson at trial. In the email, dated November 21, 2022, to Peterson, with a copy to Mgdesyan, Holley stated she was "not comfortable" advancing a defense

40

theory that it was Kelsey Harris—and not Peterson—who shot Pete. In Holley's view, it was not "a viable strategy." Holley recommended that Peterson "discuss with [Mgdesyan] his [Mgdesyan's] willingness and ability to move forward with that defense."

The record—again, an email Peterson filed in the trial court—reflects a third issue. On December 18, 2022, Holley emailed Peterson to "let [him] know" that she was going to file a motion to withdraw as one of his attorneys of record. Holley stated evidence had been "elicited" during Harris's testimony that Holley "was somehow involved in facilitating an arrangement between [Peterson] and [Harris] whereby [Peterson] would finance [Harris's] business (or something like that) in order to curry favor with her, thereby aligning your and her interests as far as the case was concerned."

Holley continued, "You and I both know that this never happened." Holley added she did not know whether Peterson actually made such a statement to Harris or whether Harris "made this up herself." Holley stated, "All I DO know is that this did not happen, nor would it EVER happen."

Holley explained, "In any event, the fact that these false allegations have been made about me—and that they are now evidence in the case—makes it a conflict (as an ethical/legal matter) for me to continue to represent you and, as a result, I am obligated to withdraw as your attorney."

Without any citation to the record, Peterson asserts, "[D]espite [prosecutors'] plain acknowledgment that Holley was not involved in the alleged bribery of Harris months earlier, prosecutors opted to wait until midtrial to raise the exact same allegations, relying on nothing more than Harris'[s] same

41

inconsistent statements dating back to September 2022." Peterson claims these allegations "le[ft] Holley with no choice but to disengage fully lest her presence harm her client."

Peterson's wholesale failure to support any of these assertions with citations to the record is telling. The letter and emails Peterson himself attached to his new trial motion show the reasons Holley did not try the case and ultimately withdrew: (1) she was engaged in a lengthy seven-month arbitration, (2) she was "not comfortable" with a defense blaming Harris for the shooting, and (3) after *Harris's* statements were introduced at trial, she concluded she had a conflict. Nothing in the record supports Peterson's allegation that prosecutors "opted to lull Holley into a false sense of security by deceptively assuring her they did not believe her to be involved."

### *The trial court did not err in imposing the midterm*

Peterson contends the trial court "reversibly erred in declining to impose the lowest possible term." Peterson's sole claim of error on this point is that the court found true the aggravating factor that the victim was particularly vulnerable within the meaning of rule 4.421(a)(3).[13]

---

[13] There was some discussion in the trial court about whether Peterson qualified for the low term under section 1170, subdivision (b)(6). That section provides, "[U]nless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence. [¶] (B) The person is a youth or was a youth

42

The trial court found four factors in aggravation: (1) that Peterson used a weapon in the commission of the crime[14] (rule 4.421(a)(2)); (2) that the victim was particularly vulnerable (rule 4.421(a)(3)); (3) Peterson's conduct toward the victim after the shooting, between the time of the crime and the trial nearly two-and-one half years later; and (4) the fact that the court could have sentenced Peterson to consecutive time on count 2, having a concealed, unregistered firearm in a vehicle (rule 4.421(a)(7)).

The court found three factors in mitigation: (1) Peterson had no prior record or an insignificant record of criminal conduct (rule 4.423(b)(1)); (2) Peterson had "actively participated in

---

as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense. [¶] (C) Prior to the instant offense, or at the time of the commission of the offense, the person is or was a victim of intimate partner violence or human trafficking." (§ 1170, subd. (b)(6).) A forensic psychologist testified at the sentencing hearing that, after Peterson's mother died when he was 11, he lived in a "very dangerous neighborhood." The trial court found, in essence, that even if this could be considered "childhood trauma" as defined in the statute, there was no nexus between that trauma and the crime in this case. Peterson has not raised the issue of his eligibility under section 1170, subdivision (b)(6) on appeal.

[14] The court noted "the jury found that to be true." The court continued, "I will note, as [the] defense points out in their sentencing memorandum, the court is limited in terms of how the court can use that if the court were using it to select the appropriate term; but, I think it's fairly clear that that aggravating factor was still proven. Does the defense wish to address that?" Defense counsel T. Edward Welbourn replied, "No, Your Honor. Withdrawn."

charitable or philanthropic causes"; and (3) Peterson had a "low likelihood of re-offending in a violent manner."

The court noted the "balancing" of the aggravating and mitigating factors was "not a mathematical calculation," and "[s]ome of the factors [were] . . . much more important to the court's decision than others."

The court did not "plac[e] great weight on [the use-of-a-firearm factor]", as it was "inherent in count[s] 1 and 3."

With respect to the aggravating factor that the victim was "particularly vulnerable," the court stated that term "includes being defen[s]eless, unguarded, unprotected or otherwise susceptible to the defendant's criminal act to a special or unusual degree." The court continued, "In determining whether someone was particularly vulnerable, you have to consider all of the circumstances surrounding the commission of the crime including the characteristics of the victim and the manner and setting in which the crime was committed. And it is not enough for the victim to be in the wrong place at the wrong time."

The court noted defense counsel had argued Pete was not "young or small in stature or elderly or somehow [otherwise] limited." The prosecution, the court said, argued Pete was "clad in a bathing suit with her back turned," she was "unarmed at that time," and she had "no idea that this would happen." Also, she was "in an unfamiliar area." In addition, it was "dark" and "early in the morning with nowhere to escape to."

After hearing further argument from both the defense and the prosecution, the court concluded the prosecution had "proven beyond a reasonable doubt that the victim was vulnerable" within the meaning of the rule.

The court viewed Peterson's "post-incident conduct" as "a major factor in aggravation in this case."

With respect to the mitigating factors, the court found Peterson's participation in charitable causes not to be "a very significant factor." The court said the fact Peterson had "been an asset to the community and ha[d] helped people out" was "not a recognized factor in mitigation" but was "important" nonetheless. Similarly, the court stated Peterson's low risk of violent recidivism was "not a major factor, but a factor."

The only one of these findings Peterson challenges on appeal is the "vulnerable victim" finding. Referring to Harris's statement to prosecutors that "she saw Peterson reach towards the center console after threatening to shoot her," Peterson contends Pete should have recognized "there were indeed signs that an armed individual may be in the vehicle" and "thus had the ability to run or duck once she saw a gun being pointed at her."

We find no error. Substantial evidence supports the trial court's true finding on that aggravating factor. Moreover, even were that not the case, no resentencing would be required. The middle term was the presumptive term. (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1038.) The court was not required to rely on *any* aggravating factors in selecting the middle term, and Peterson does not dispute the presence of three of the four aggravating factors the court identified. (See *People v. Yim* (2007) 152 Cal.App.4th 366, 369 ["single aggravating factor may support a sentencing choice"].) All the trial court was required to do in selecting the middle term was to state its reasons. (*People v. Sarmiento-Zuniga* (2025) 108 Cal.App.5th 1216, 1226.) The court did that here.

### *No ineffective assistance of counsel or cumulative error*

As we find no ineffective assistance of counsel or prejudicial trial court error, we also find no cumulative error.

### **DISPOSITION**

We affirm Daystar Peterson's conviction.

### **NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

ADAMS, J.